WINSTON & STRAWN LLP
The Legal Center
One Riverfront Plaza, Suite 730
Newark, New Jersey 07102
(973) 848-7676
James S. Richter
Melissa Steedle Bogad

*Attorneys for Plaintiff Skyline Steel, LLC*

[*Additional Counsel Listed on Signature Page*]

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ x | |
| SKYLINE STEEL, LLC, : | |
| : | Hon. |
| Plaintiff, : | |
| : | Civil Action No. |
| v. : | |
| : | |
| : | |
| PILEPRO LLC, PILEPRO SALES CORP., : | **COMPLAINT AND JURY DEMAND** |
| INC., PILEPRO STEEL L.P., and PLYMOUTH : | |
| TUBE COMPANY, : | |
| : | |
| Defendants. : | |
| : | |
| : | |
| ⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯ X | |

## TABLE OF CONTENTS

NATURE OF ACTION ................................................................................................ 1

THE PARTIES ............................................................................................................ 7

    A.    Plaintiff ............................................................................................... 7

    B.    Defendants .......................................................................................... 8

JURISDICTION AND VENUE ................................................................................. 9

TRADE AND COMMERCE ..................................................................................... 11

    A.    The Steel Piling and Connector Industry .................................. 11

    B.    The Relevant Markets ..................................................................... 17

        1.    Product Markets .......................................................................... 17

        2.    Geographic Market ..................................................................... 20

BACKGROUND ....................................................................................................... 21

    A.    Skyline Enters the Steel Connector Business ........................... 21

    B.    Defendants' Conspiracy and Retaliation Against Skyline ........... 23

        1.    PilePro's Baseless Litigation ..................................................... 24

        2.    Plymouth's Initial Refusals to Deal with Skyline, and Its Economically Irrational Behavior But for a Conspiracy, from May Through September 2011 ........................ 25

        3.    Settlement of the PilePro Baseless Patent Litigation in October 2011 ........................ 28

        4.    Discovery of Exclusive Dealing Arrangement Between Defendants ........................... 31

        5.    Other Anticompetitive Acts ......................................................... 33

            (a)    PilePro's Unfair and Deceptive Refusal to Supply SWC-120 Connectors to Skyline ........................ 33

            (b)    PilePro's Abuse of the Justice System and Unfair and Deceptive Use of the iSheetPile Website to Divert Customers Away From Skyline and Towards Itself in December 2010 ........................ 36

      (c)     PilePro Poaches Skyline's Key Executive Involved in Entering the Connector Market in August 2011 ........................................................................................... 38

    6.    Anticompetitive Effects.................................................................................. 39

   C.    Termination of the Settlement Agreement and Steps Taken in Preparation for Arbitration ........................................................................................................ 43

CAUSES OF ACTION ............................................................................................... 46

PRAYER FOR RELIEF ............................................................................................. 68

DEMAND FOR JURY TRIAL .................................................................................. 72

CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 40.1.......................... 73

CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1 ........................................... 74

Plaintiff Skyline Steel, LLC ("Skyline"), by its attorneys, brings this action for damages, declaratory judgments, and injunctive relief against Defendants PilePro LLC ("PilePro LLC"), PilePro Sales Corp., Inc. ("PilePro Sales"), PilePro Steel L.P. ("PilePro Steel") (collectively, "PilePro"), and Plymouth Tube Company ("Plymouth").  Skyline alleges as follows:

## NATURE OF ACTION

1.      This action concerns the anticompetitive and exclusionary conduct of PilePro and Plymouth relating to modular steel connectors ("Connectors").  Connectors are formed through a production process called "extrusion," in which steel is forced by compression through a die used to shape steel into long, specialized shapes designed to hold together vertical wall components of steel sheet pile ("sheet piling") or long steel pipes ("pipe piling" or "O-Pile piling").  Sheet piling or pipe piling is driven into the ground to create structural foundation walls primarily for the purpose of retaining soil or water.

2.      PilePro is the only company that manufactures and sells Connectors that are extruded in the United States ("Domestic Connectors").  PilePro also contracts for the manufacture of Connectors abroad that are imported into the United States ("Foreign Connectors").  Plymouth is the only company that extrudes Domestic Connectors on behalf of any Connector manufacturer in the United States.  PilePro has enlisted co-conspirators, such as Plymouth, to eliminate competition for the design, manufacture, and sale of Domestic Connectors, thereby forcing customers that wish to use Connectors to purchase PilePro's Connectors, regardless of whether a project uses sheet piling, pipe piling, or a combination of the two.

3.      In 2010, Skyline sought to compete as a designer, manufacturer, and seller of Connectors against PilePro, which was then the only company in the United States that designed

1

and manufactured Domestic Connectors.  Soon after Skyline began selling Connectors that were designed by Skyline and extruded on Skyline's behalf by Plymouth, PilePro and Plymouth entered into an anticompetitive exclusive dealing agreement of unreasonable breadth and duration that had the effect of foreclosing Skyline from competing with PilePro for the design, manufacture, and sale of Connectors.  This agreement, which cut Skyline off from its only source for Domestic Connector extrusion services, is unreasonable, given the structure of the market. Among other things, it is unreasonably long in that it extends through December 12, 2021, and it is unreasonably broad in that it prohibits Plymouth from extruding *all* Connectors or *any other type of product* for Skyline.   Such an unreasonable restraint cannot be justified by any purportedly procompetitive virtues.   Rather, this agreement was forged in retaliation for Skyline's attempt to compete with PilePro for the design, manufacture, and sale of Connectors; is against Plymouth's rational economic self-interest but for a conspiracy to share monopoly profits; and is but one of many anticompetitive acts detailed in this Complaint that were committed in furtherance of Defendants' unlawful conspiracy in order to acquire and/or maintain their respective monopolies and to share monopoly profits.  To redress this unreasonable restraint of trade and monopolization, Skyline seeks injunctive relief and damages against Defendants for their violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2; the New Jersey Antitrust Act ("NJAA"), N.J.S.A. 56:9-3 and 56:9-4; and New Jersey common law pertaining to unfair competition.

4.      Skyline also seeks damages, declaratory judgments, and injunctive relief to redress PilePro's anticompetitive misuse of non-infringed patents and baseless, sham litigation pursued to coerce Skyline to stop manufacturing its superior line of Connectors in competition with PilePro.  Having cut Skyline off from its only source for domestic extrusion, PilePro was

2

able to coerce Skyline into an anticompetitive purchase agreement settling a baseless patent infringement litigation (the "Settlement Agreement") that required Skyline to stop manufacturing its Connectors — including those not accused of patent infringement — in any market.  This was accomplished, in part, by misrepresenting to Skyline that PilePro would supply Skyline with "all" Connectors required by Skyline at prices specified in the Settlement Agreement.  Soon after eliminating Skyline as a competitor, however, PilePro further abused its market power by demanding supracompetitive prices and delaying, or refusing to ship, Connectors, thereby harming competition through both the reduction of output and the inflation of prices above competitive levels.

5.      Before settling, PilePro's Domestic Connector prices to Skyline were either comparable to, or less than, prices for its Foreign Connectors of the same shape, but after securing the Settlement Agreement, PilePro raised its Domestic Connector prices by *30% or more* above the prices specified in the Settlement Agreement.  These new Domestic Connector prices were also significantly higher than what Skyline had been paying PilePro prior to settling. Just weeks after settling, PilePro took the surprising and pretextual position that the price list in the Settlement Agreement only applied to Foreign Connectors, even though the Settlement Agreement applied on its face to "all" Connectors and its price list did not distinguish between Domestic and Foreign Connectors.  Although PilePro must pay freight charges and fees to import its Foreign Connectors from Germany, there has generally been no corresponding 30% increase in Foreign Connector prices.  While Skyline has terminated the Settlement Agreement and seeks a declaration it was void *ab initio*, the 30% increase above the prices in that contract for Domestic Connectors and the post-conspiracy disparity between Domestic and Foreign

3

Connector prices provide strong, economic evidence of Defendants' conspiracy and exertion of market power.

6.    In light of PilePro's practice of filing baseless litigation, as discussed further below, Skyline seeks a declaratory judgment that Skyline does not infringe any valid or enforceable claim of various PilePro patents, specifically:  U.S. Patent No. 7,390,145, entitled "Connecting Element for Sheet Piles" ("the '145 Patent") (attached hereto as Ex. A); U.S. Patent No. 7,753,623, entitled "Connecting Profile for Interconnecting Three Sheet Pile Wall Components and an Arrangement of Sheet Pile Wall Components Comprising Such a Connecting Profile" ("the '623 Patent") (attached hereto as Ex. B); U.S. Design Patent No. D465,288, entitled "Connection Element for Sheet Piles" ("the '288 Patent") (attached hereto as Ex. C); U.S. Design Patent No. D621,245, entitled "UMHW T-Mount New Sheet Pile Connecting Element" ("the '245 Patent") (attached hereto as Ex. D); and U.S. Design Patent No. D622,579, entitled "UMHW T-Mount New, Small Sheet Pile Connecting Element" ("the '579 Patent") (attached hereto as Ex. E) (collectively, "the PilePro Asserted Patents").  Skyline also seeks a declaratory judgment that one or more claims of the PilePro Asserted Patents are invalid; a judgment that PilePro LLC and PilePro Sales Corp.'s prior patent infringement litigation against Skyline was a sham litigation; and a declaratory judgment that the PilePro Asserted Patents and the Settlement Agreement are unenforceable against Skyline due to PilePro's patent misuse, sham litigation, and antitrust violations.  Finally, Skyline seeks a stay and/or dismissal of any arbitration with respect to such Settlement Agreement until the invalidity and unenforceability of the Settlement Agreement against Skyline can be confirmed pursuant to this proceeding.

7.     The unlawful exclusive dealing agreement between PilePro and Plymouth is part of a larger, systematic, and anticompetitive conspiracy led by PilePro to tie up the vertical distribution channels for Connectors through the use of unduly restrictive exclusive dealing arrangements.   This web of anticompetitive agreements is expressly designed to foreclose competition so that customers are forced to purchase certain types of sheet and pipe piling that use Connectors made exclusively by PilePro, irrespective of whether such piling is a more efficient, cost-effective, or desirable solution for customers.   To this end, Defendants have not only harmed competition for the design, manufacture, and sale of Connectors, but have furthermore harmed competition for the supply of sheet piling.

8.     Indeed, PilePro has circulated a document entitled "7 Steel Samurai: A Proposal for a Joint Venture" throughout the sheet piling industry.   *See* Ex. F (Seven Steel Samurai manifesto).   This manifesto asks contractors, engineers, designers, marketers, suppliers, manufacturers, and mill owners to band together to "establish franchises in global markets via local pipe plants whereby 75% of the steel wall system is sourced locally [i.e., not by Skyline's main sheet piling supplier] and the balance is provided by SWS," short for "Steel Wall Systems, Global," the purported "joint venture" for which PilePro advocates.   Ex. F at 1, 4.   Thus, under the Seven Steel Samurai plan, 100% of the global steel wall piling supply would be provided by either a local PilePro franchisee or PilePro's joint venture, thereby "quickly establish[ing] [SWS] as one of the dominant steel companies in the world."   Ex. F at 14.   The Seven Steel Samurai manifesto further explains that "SWS will foster a new type of symbiotic relationship between the steel producer and the marketplace; and this alliance, that is at the heart of SWS, *will be locked into place as a continuous force* — a force to be reckoned with — *not just for one steel*

*deal but for any and all transactions going forward, for decades to come*." Ex. F at 8 (emphasis added).

9.      Plymouth stood to gain handsomely from a conspiracy with PilePro that would allow Plymouth to reap the financial benefits of market power exerted over not just its customers, but also those of PilePro.  With the elimination of PilePro's competitors, PilePro would be free to extract monopoly profits from a larger number of customers, as compared to the more limited number of customers from which Plymouth could already extract monopoly profits on its own.  PilePro could then afford to pay Plymouth more, in consideration of Plymouth's exclusionary conduct.  The evidence suggests this is just what happened here.  PilePro, for example, has asserted since settling that its manufacturing costs for Domestic Connectors extruded by Plymouth *are actually higher* than its costs for Connectors manufactured for PilePro in Germany.

10.      The Seven Steel Samurai manifesto states that PilePro, which "sells the key ingredients" (Connectors) that make sheet piling systems "work best," will stand at the forefront of the industry's "own band of hungry samurai" to help contractors use "Ball & Socket" sheet piling and "O-Pile" pipe piling systems — which use types of Connectors that PilePro has monopolized ("Ball & Socket Connectors" and "O-Pile Connectors") — instead of "Larssen" sheet piling systems, which use a type of Connector that PilePro has not yet been able to monopolize ("Larssen Connectors").  Ex. F at 5-6.  While the manifesto speaks in terms of "liberating" contractors from Larssen sheet piling systems, the purported "freedom" contractors will gain is the ability to choose from one source:  PilePro, which will have "sheet piling options incorporating PilePro [C]onnectors" that "will be strategically stockpiled around the globe."  Ex. F at 7-8.

6

11.     As the manifesto notes, "[C]onnectors have grown from a niche market into an essential necessity for any steel retaining wall project." Ex. F at 6.  PilePro further proclaims in the manifesto that it has ascended to "the top of its market," through an "aggressive expansion out of the European market into the United States," entering this market "well-armed" with patents, which have "enabled the company to effectively escalate its presence in the industry." Ex. F at 6.  The patents PilePro has employed as a weapon, however, are limited design and utility patents that engineers can — and in Skyline's case did — design around with superior products.  But that has not stopped PilePro from asserting those patents in bad faith through the use of baseless, sham litigation in order to coerce its rivals into anticompetitive settlements.  It is because of such anticompetitive conduct that PilePro is able to pronounce that "[t]oday, PilePro is the world's only full-line manufacturer of connectors for the steel retaining wall industry." Ex. F at 6.

12.     While *legitimate* exclusive dealing arrangements, joint ventures, and the enforcement of patent rights can sometimes serve procompetitive interests, PilePro has built a business model on locking up markets, foreclosing competition from suppliers of Connectors and Larssen sheet piling systems, enlisting co-conspirators (including Plymouth and others yet to be identified), and intimidating competitors with baseless litigation and the misuse of its limited design and utility patents in order to harm competition, reduce customer choice, and consolidate and maintain its monopoly power.

## THE PARTIES

### A.     Plaintiff

13.     Plaintiff Skyline is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Parsippany, New Jersey.  Skyline is in the business of designing, engineering, and selling steel sheet pilings and steel sheet piling

systems.  Prior to Defendants' unlawful acts eliminating Skyline as a competitor, Skyline was also in the business of designing, engineering, manufacturing, and selling Connectors for use with sheet pile wall components.

    **B.    Defendants**

    14.    Defendant PilePro LLC is a limited liability company organized under the laws of the State of Delaware, with its principal place of business in Austin, Texas.  PilePro LLC is the holding company for the PilePro group of companies.  For a period of time relevant to this Complaint, PilePro LLC designed Connectors for use with sheet pile wall components.  PilePro LLC owns certain patents relevant to this action.  Roberto Wendt ("Wendt") controls the operation of PilePro LLC.

    15.    Defendant PilePro Sales Corp., Inc., is a corporation organized under the laws of the State of Nevada, with its principal place of business in Austin, Texas.  For a period of time relevant to this Complaint, PilePro Sales manufactured, distributed, and sold Connectors, and was the licensee of certain patents owned by PilePro LLC.  Wendt is the President of PilePro Sales.

    16.    Defendant PilePro Steel L.P. is a limited partnership organized under the laws of the State of Texas, with its principal place of business in Austin, Texas.  PilePro Steel designs, engineers, manufactures, distributes, and sells Connectors, and is the successor-in-interest to certain rights previously owned by PilePro Sales, including the patent license rights mentioned above.  Wendt is a partner of PilePro Steel.

    17.    PilePro LLC, PilePro Sales, and PilePro Steel are privately held and hold themselves out to the public (including in litigation that they have commenced) as a unified group of companies selling Connectors under the leadership of Wendt.  PilePro holds itself out as the "world's only full line connector manufacturer for the steel sheet pile industry."

18.     Defendant Plymouth Tube Company is a corporation organized under the laws of the State of Michigan, with its principal place of business in Warrenville, Illinois.  Plymouth is registered with the New Jersey Department of Treasury, Division of Revenue & Enterprise Services, to do business in the State of New Jersey.  Plymouth manufactures steel tubing at metalworking mills that it owns across the United States.  Plymouth also provides manufacturing services for Connectors and other products, using a process called extrusion, for Connector producers, such as PilePro and previously Skyline.  To Skyline's knowledge, Plymouth has been the only company in the United States that is commercially offering the service of extruding Connectors at all times relevant to this Complaint.

JURISDICTION AND VENUE

19.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate Skyline for its damages.  This Court has jurisdiction over the federal antitrust law claims alleged herein pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331, 1337.

20.     This action arises, in part, under the New Jersey Antitrust Act ("NJAA"), N.J.S.A. 56:9-1 to -19, and New Jersey common law pertaining to unfair competition.  This Court has supplemental jurisdiction over Skyline's claims arising under the NJAA and New Jersey common law pursuant to 28 U.S.C. § 1367 because the facts alleged herein support antitrust claims under both federal and New Jersey law.

21.     This action arises, in part, under the Patent Laws of the United States, Title 35 of the United States Code, 35 U.S.C. § 1, *et seq.*, and the Declaratory Judgment Act, 28 U.S.C. §§ 2201, 2202.  Based on the allegations set forth herein, there is an actual controversy between Skyline and PilePro regarding the non-infringement, unenforceability, and invalidity of the

9

PilePro Asserted Patents, and the unenforceability of the Settlement Agreement.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1338, 2201, and 2202.

22.     This Court has personal jurisdiction over PilePro and Plymouth pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22.

23.     This Court also has personal jurisdiction over PilePro because PilePro regularly does and solicits substantial business in New Jersey, either directly or through intermediaries, is continuously and systematically present in New Jersey, and has established minimum contacts with New Jersey, in particular by conducting regular and substantial business with Skyline, which maintains its principal place of business in New Jersey, since at least 2005, including: regularly selling products to Skyline over a course of at least eight years; entering into the Settlement Agreement with Skyline, which Skyline seeks to be declared unenforceable in this action; invoicing Skyline in New Jersey; and attending meetings with Skyline in New Jersey.  In light of PilePro's substantial contacts with New Jersey, the exercise of jurisdiction over PilePro would not offend traditional notions of fair play and substantial justice.  Furthermore, PilePro's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Skyline, a company located in this District.  The effects of the unlawful conduct alleged below were felt by Skyline in this District, where Skyline maintains its principal place of business.

24.     This Court also has personal jurisdiction over Plymouth because Plymouth has been registered to conduct business in New Jersey since at least 2006 and Plymouth regularly transacts and solicits substantial business in New Jersey, either directly or through intermediaries.  In particular, Plymouth sold extrusion services to Skyline in 2010 and 2011, and has availed itself of this Court, having previously filed and litigated at least one lawsuit in the District of New Jersey, such that the exercise of jurisdiction over Plymouth would not offend

traditional notions of fair play and substantial justice. Furthermore, Plymouth's unlawful conduct alleged herein was directed at, and had the intended effect of, causing injury to Skyline, a company located in this District. The effects of the unlawful conduct alleged below were felt by Skyline in this District, where Skyline maintains its principal place of business. As a result of the conspiracy alleged below, Skyline can no longer obtain extrusion services from Plymouth for the manufacture of Connectors.

25.     Venue is proper in this judicial district pursuant to Section 12 of the Clayton Act, 15 U.S.C. § 22, and 28 U.S.C. § 1391(b)-(d) because a substantial part of the events giving rise to Plaintiff's claims occurred in this District, a substantial portion of the affected interstate trade and commerce discussed below has been carried out in this District, and one or more Defendants reside, are licensed to do business in, are doing business in, had agents in, or are found or transact business in this District.

### TRADE AND COMMERCE

**A.     The Steel Piling and Connector Industry**

26.     The Parties provide products and services used in connection with the steel sheet and pipe piling industry, which involves the design, manufacture, and sale of steel products used in public and private projects.

27.     Steel sheet piles are long structural sections with a vertical interlocking system that creates a continuous wall or enclosure. Sheet piling systems are most often used to retain soil or water in connection with construction projects, but can be used for many different purposes, including to retain structures, strengthen levees, dewater large areas used for the construction of locks and dams, construct bridge abutments, create environmental barrier walls, reinforce depressed roads or railways, and stabilize structures. Sheet piling can be installed as a

11

permanent part of a structure, such as a bridge abutment, or be used temporarily, such as to create safe access to a construction pit.

28.     Sheet piles are made in several types.  Each type has distinctly shaped interlocks on the edge of each pile that fit together with sheet piles of the same type to form sheet piling walls.

29.     Sheet piling walls, in turn, can be interconnected at "corners" or "junctions" by specialized connection components, such as by a custom process that involves cutting, bending, bolting, welding, or otherwise "fabricating" a connection between the sheet piles in order to hold the sheet piling system together.

30.     Instead of being fabricated, Connectors are extruded into separate, modular components specially designed to connect two or more sections of sheet piling.  PilePro asserts that Connectors can solve many problems that may be associated with welded or "fabricated" connections.  PilePro further asserts that Connectors provide engineers and contractors with the ability to design and construct wall systems with greater reliability, more strength, and a longer lifespan, while still enabling the engineers and contractors to deal with myriad design and construction issues in ways that would not be possible with other methods.  Connectors can also make it possible to design and build steel sheet piling wall systems at a lower cost, with less labor, and with less maintenance.  Accordingly, fabrication is not a sufficiently close economic substitute for Connectors.

31.     Through the process of steel extrusion, Connectors are molded into long pieces of steel shaped to fit into the distinct interlock shapes of the various types of sheet piling, like matching pieces of a puzzle, in order to form a seamless and durable connection between sheet

12

piles.  Moreover, different types of Connectors are used depending upon the angle desired at the job site (for example, a 90-degree turn, a "T" intersection of sheet piling, etc.).

32.     Connectors are also used to hold "O-Pile" or pipe piling together.  As the name suggests, "O-Pile" systems use a series of long, steel pipes to form a wall or enclosure for the purpose of retaining soil or water.

33.     Sheet piling or pipe piling can be used separately to form a "continuous" wall of either sheet piling or pipe piling, or, alternatively, can be used together to form a "combination" wall that includes both sheet and pipe piling.

34.     Steel sheet or pipe piling is often used in construction projects with public or municipal entities (e.g., public transportation renovation).  Getting the needed materials to these construction sites is a multi-step process.  First, the site owner generally engages an engineering firm to design the project and a general contractor to perform the actual construction.  The engineers set specifications for the materials needed — for instance, the size and characteristics of the sheet or pipe piling.  It is then the general contractor's task to go into the market and procure materials meeting the engineers' specifications.  The general contractor may also be required by contract, law, or regulation to procure only domestically produced steel and other materials, as described in more detail below.

35.     The general contractor then reaches out to companies, such as Skyline or its competitors in the piling market (for example, L.B. Foster Company ("L.B. Foster")), to provide a complete piling system, including both the sheet and/or pipe piling and Connectors, that will comply with the engineers' and site owner's specifications.  After being forced off the market as a competitor of PilePro, Skyline purchases Connectors from distributors such as PilePro for

13

resale to the general contractor as part of the complete sheet piling package.  PilePro, in turn, engages mills, such as Plymouth, to extrude the Connectors for sale to entities like Skyline.

36.     Several laws and regulations governing public works projects require steel sheet piling and Connectors to be sourced, in many circumstances, solely from manufacturing facilities in the United States.  For example, the Buy American, 41 U.S.C. § 8302, and Buy America, 49 U.S.C. § 5323(j), Acts require, among other things, that public construction projects use (with limited exceptions) domestic products, i.e., products manufactured in the United States.  Many state and local governments have similar statutes or regulations imposing a domestic-only requirement.

37.     As a result of this legal framework, projects and/or requests for proposal often specify that potential bidders and suppliers provide quotes for domestic steel products when they are available.  More recently, Section 1605 of the American Recovery and Reinvestment Act of 2009 ("ARRA") prohibits industry participants from using "the funds appropriated or otherwise made available by this Act … for a project for the construction, alteration, maintenance, or repair of a public building or public work unless all of the iron, steel, and manufactured goods used in the project are produced in the United States."  Pub. L. No. 111-5, § 1605, 123 Stat. 115, 303 (2009).

38.     Accordingly, in the wake of ARRA, there have been increased economic incentives for competitors to enter the market for the domestically produced steel Connectors that are needed for ARRA-funded projects.

39.     Projects that have "domestic-only" requirements specifying that steel products used on site must be produced domestically ("Domestic-Only Projects") effectively require

Connectors supplied by PilePro because PilePro has a monopoly on the manufacture of Domestic Connectors.

40.     For all times relevant to this Complaint through the present, Skyline has frequently submitted bids for Domestic-Only Projects, such as public works projects, and has in fact supplied steel sheet piling systems and Connectors that were required by law and/or by the customer's specifications to be sourced solely from manufacturing facilities in the United States.

41.     "Larssen," "Ball & Socket," and "Flat Sheet" are different types of sheet piling. Flat Sheet piling is also referred to as "Open Cell" sheet pile because it is used for a particular type of sheet piling design called an "Open Cell" system.

42.     PilePro is currently the only manufacturer of Domestic Connectors, as well as the only manufacturer of Connectors used for certain types of sheet piling systems in the United States.  Although Skyline has been able to import limited types of Connectors from another, foreign source, to Skyline's knowledge, PilePro is the only Connector manufacturer — other than Skyline — that has sold Domestic Connectors during the time period relevant to this Complaint.

43.     For example, with the exception of the limited time during which Skyline was manufacturing Connectors, PilePro has been the sole manufacturer in North America of Domestic Ball & Socket Connectors, which are used with Ball & Socket sheet pilings.  PilePro has also been the dominant manufacturer of all Ball & Socket Connectors sold in the United States, including both Domestic and Foreign Ball & Socket Connectors.

44.     PilePro has also been the sole manufacturer of SWC-120 Connectors, which are exclusively manufactured overseas and have been the only type of Connectors specified for Open Cell sheet piling systems.

15

45.     In contrast, PilePro is not the only manufacturer of Larssen Connectors, which are generally imported to the United States and used with Larssen sheet piling.

46.     Except where Flat Sheet/Open Cell piling is specified, Domestic-Only Projects requiring sheet piling effectively require the use of Ball & Socket sheet piling because there is currently no domestic source for Larssen Sheet piling.  Such Domestic-Only Projects therefore also effectively require Ball & Socket Connectors manufactured by PilePro because those are generally the only type of Connectors that will work with Ball & Socket sheet pile interlocks and because PilePro is the only company that manufactures Domestic Connectors for Ball & Socket sheet piling.

47.     PilePro also promotes "O-Pile" systems as an alternative to traditional sheet piling systems.  O-Pile systems are composed of either a series of steel pipes held together with O-Pile Connectors; or a series of pipes, sheet piling, and Connectors.  PilePro generally promotes Ball & Socket sheet piling as the only sheet piling to be used in combination with O-Pile systems, such that a combination wall would use Ball & Socket Connectors (for attachment to the Ball & Socket sheet piling) and O-Pile Connectors (for attachment to the pipe piling).  O-Pile systems use more Connectors per linear foot than traditional sheet piling systems.

48.     As is the case with Domestic-Only sheet piling projects, Domestic-Only Projects specifying the use of pipe piling in either a continuous or combination wall effectively require the use of Connectors manufactured by PilePro because PilePro is the only company that manufactures Domestic Connectors.

49.     Because Connectors represent a small percentage of the cost of a sheet or pipe piling system in comparison to the wall components of the piling system, the type of Connectors used for any project is driven by the selection of the type of piling to be used.

16

B.      **The Relevant Markets**

1.      **Product Markets**

50.     PilePro holds itself out as the "world's only full line connector manufacturer for the steel sheet pile industry."

51.     There are at least five relevant product markets in which to evaluate Defendants' anticompetitive conduct.

52.     The first relevant product market is the market for the design, manufacture, and sale of Domestic Connectors ("Domestic Connector Market"). PilePro is the only manufacturer of Domestic Connectors and thus has a 100% market share and market power in such market. No other product is a sufficiently close economic substitute for Domestic Connectors in Domestic-Only Projects to constrain to competitive levels the prices PilePro can charge for Domestic Connectors used in such projects.

53.     The second relevant product market is the market for the design, manufacture, and sale of Ball & Socket Connectors ("Ball & Socket Connector Market"), which includes both Domestic and Foreign Ball & Socket Connectors. Upon information and belief, PilePro's share of the Ball & Socket Connector Market is at or near 80 to 90% of the market, such that PilePro has market power in the Ball & Socket Connector Market. There are no widely used substitutes for Ball & Socket Connectors for use with Ball & Socket sheet piling, as other Connector types generally cannot be used with Ball & Socket sheet piling. No other product is a sufficiently close economic substitute to constrain the prices PilePro can charge for Ball & Socket Connectors to competitive levels.

54.     The third relevant product market is the market for the design, manufacture, and sale of Ball & Socket Connectors for use in Domestic-Only Projects ("Domestic Ball & Socket Connector Market"). The Domestic Ball & Socket Connector Market is a submarket of both the

17

Ball & Socket Connector Market and the Domestic Connector Market.  PilePro has market power in the Domestic Ball & Socket Connector Market; its share of the market is at or near 100%.  By its own admission, PilePro is the exclusive wholesale supplier of Ball & Socket Connectors in the United States for use in Domestic-Only Projects.  Other companies that have attempted to enter this market, such as Steelwall GmbH ("Steelwall"), have been unable to obtain access to the extrusion services required to manufacture Domestic Ball & Socket Connectors.  No other product is a sufficiently close economic substitute for Domestic Ball & Socket Connectors for use with Ball & Socket sheet piling in Domestic-Only Projects to constrain to competitive levels the prices PilePro can charge for Domestic Ball & Socket Connectors used in such projects.

55.     The fourth relevant product market is the market for the extrusion of steel products for use in Domestic-Only Projects ("Domestic Steel Extrusion Market").   On information and belief, Plymouth is one of only a few steel extrusion mills in the United States.  Thus, there are few, if any, reasonably interchangeable substitutes, depending on the type of product to be extruded, that are capable of restraining Plymouth's pricing.

56.     The fifth relevant product market is the market for the extrusion of Connectors for use in Domestic-Only Projects ("Domestic Connector Extrusion Market").   The Domestic Connector Extrusion Market is a submarket of the Domestic Steel Extrusion Market.  Plymouth has market power in the Domestic Connector Extrusion Market; its share of the market is at or near 100%.  Plymouth is the only United States source of originally extruded sheet piling Connectors for resale, and thus no other product is a sufficiently close economic substitute to constrain the prices Plymouth can charge to competitive levels.  After being cut off by Plymouth in 2011, Skyline has attempted, but has been unable, to locate any alternative to Plymouth

18

capable of extruding Connectors in the United States.  Upon information and belief, Steelwall, a potential entrant in the Domestic Connector Extrusion Market, similarly searched for, but was unable to find, an extruder to manufacture Connectors in the United States on its behalf.

57.    Steel extrusion mills cannot easily switch to producing Connectors from producing other types of extruded steel products because of conversion costs and the physical limitations of each individual extruder.  Nor are there other types of products that are reasonable economic substitutes for Connectors.

58.    The Domestic Connector Market, Domestic Ball & Socket Connector Market, Domestic Steel Extrusion Market, and Domestic Connector Extrusion Market (the "Domestic Markets") are distinct from the non-domestic product markets because foreign-sourced steel is not a reasonably interchangeable substitute for domestic steel in Domestic-Only Projects.

59.    Domestic Connectors sold for use in Domestic-Only Projects are sold by PilePro at higher prices than similar Foreign Connectors sold for use in projects that are not specified as Domestic-Only Projects.  PilePro has represented that its costs (i.e., Plymouth's prices) for Domestic Connectors are higher than its costs for similar Foreign Connectors manufactured in Germany, despite the costs required to import Foreign Connectors.

60.    The Domestic Connector Market, Ball & Socket Connector Market, and Domestic Ball & Socket Connector Market (collectively, the "Connector Markets") and the Domestic Steel Extrusion Market and Domestic Connector Extrusion Market (collectively, the "Extrusion Markets") discussed above are all highly concentrated markets that have substantial barriers to entry.  Moreover, the cross-elasticity of supply for these markets is low, such that PilePro and Plymouth are able to extract monopoly profits in these markets.

19

61.     Potential entrants in the Connector Markets discussed above are impeded from entering the market because PilePro has tied up much, if not all, of the available capacity for Connector extrusion through the use of unreasonably broad and restrictive exclusive dealing arrangements.  The minimal degrees to which Skyline and Steelwall have been able to enter the Connector Markets demonstrate the significant barriers to entering these markets.   Indeed, PilePro has successfully excluded all competitors from the Domestic Connector Market in its entirety.

62.     Potential entrants into the Extrusion Markets discussed above also face substantial barriers to entry.  Mills that are already capable of extruding steel in the United States cannot easily switch to producing Connectors or many other new types of extruded steel products because of conversion costs and because the ability of each mill to produce steel products of particular shapes and sizes is limited by the physical characteristics of the individual extruder. Constructing a new mill capable of extruding Connectors or a wider variety of steel products would require substantial resources, capital, labor, and time.  The limited number of extrusion facilities in the United States demonstrates that the barriers to entering these markets are formidable.

### 2.     Geographic Market

63.     The relevant geographic market is the United States.  To compete effectively within the United States, Connector manufacturers, sellers, and extrusion service providers need distribution assets and relationships within the United States.  Connector manufacturers, sellers, and extrusion service providers located outside of the United States that lack such assets and relationships are unable to constrain the prices of Connector manufacturers, sellers, and extrusion service providers that have such domestic assets and relationships.  Moreover, with respect to the

Domestic Markets, Connector manufacturers, sellers, and extrusion service providers located outside of the United States plainly cannot be used.

## BACKGROUND

### A.  Skyline Enters the Steel Connector Business

64.    Prior to 2010, Skyline did not design, manufacture, or sell its own Connectors. When supplying a sheet piling system, Skyline would generally resell Domestic and Foreign Connectors obtained from PilePro.

65.    Before 2010, Skyline enjoyed a relatively stable business relationship with PilePro.  Skyline had ordered Connectors from PilePro in amounts that exceeded $1 million per year.  Skyline was generally satisfied with PilePro's ability to fill orders in a timely manner, regardless of the size of the order, and did not have any notable disputes with PilePro concerning erratic changes in prices, delivery terms, or delays.

66.    In or about 2010, Skyline determined that it would begin to market and sell Connectors of its own design to compete with those being distributed by PilePro.  In order to accomplish this, Skyline entered into a business arrangement with Plymouth pursuant to which Plymouth would make Connectors for Skyline by extruding steel into shapes specified by Skyline.  To Skyline's knowledge, Plymouth is the only company in the United States that extrudes Connectors.

67.    Before ordering Connectors from Plymouth and beginning to sell them, Skyline commissioned a "freedom to operate" analysis to assess whether there would be any potential intellectual property issues that might arise from the manufacture and sale of its own Connector designs.  Heading this effort was Gerry McShane ("McShane"), who at the time was Skyline's Vice President of Engineering.  McShane engaged and coordinated with outside patent counsel as part of this effort.  He also participated in visits to and discussions with Plymouth to ensure

21

that Plymouth had no problem extruding Connectors for both PilePro and Skyline.  At no time during these preliminary discussions with Plymouth did any Plymouth representative indicate that there was any capacity or other issues preventing Plymouth from extruding Connectors for both PilePro and Skyline.  Throughout the process, McShane was instrumental in Skyline's effort to enter the market as a competitor to PilePro by vertically integrating its Connector business so that Skyline could more efficiently provide Connectors to its sheet piling customers.

68.    Skyline's Connectors represented a significant improvement over the PilePro designs then on the market.  Sheet piles typically have differently shaped interlocks on either end of each section of sheet piling — a "male" interlock on one end and a "female" interlock on the other.  One or more of Skyline's Connectors are specially designed to be able to fit into either the male or female interlock, in several different orientations, simply by rotating the Connector. This design means that one of Skyline's Connectors can do the job of up to four of PilePro's Connectors.

69.    The versatility of Skyline's Connectors created substantial efficiencies for customers.  Customers' stocking costs were reduced as they did not have to pay for warehouse space to store multiple different types of Connectors.   The Skyline Connectors simplified ordering and reduced the chance of ordering errors.  They minimized the possibility of a job site delay due to the lack of an appropriate Connector on site, as one Skyline Connector shape could do the job of up to four PilePro shapes.  Moreover, if a contractor made a mistake on the job site, or if the project design changed somewhat and a segment of sheet piling was installed differently than planned, there was no need to undertake the labor of uninstalling the sheet piling or to purchase an additional Connector; the contractor could simply rotate one of the versatile Skyline

Connectors he already had to fit.  If there were Skyline Connectors left over after a job was finished, they could be easily reused in a future job.

70.     Furthermore, the fact that Skyline produced its own Connectors meant that Skyline's customers could now (unlike when Skyline ordered PilePro Connectors) receive their entire sheet piling system, both the sheet piles and the Connectors, in one single shipment.  This eliminated wasted time on the job site, including the process of waiting for and unloading multiple trucks with separate shipments.

71.     Customers responded positively to Skyline's entry into the market for the design, manufacture, and sale of Connectors.  They appreciated the convenience and versatility of Skyline's products, as well as the fact that Skyline's Connectors were manufactured in the United States and were therefore suitable for Domestic-Only Projects.

**B.     Defendants' Conspiracy and Retaliation Against Skyline**

72.     Defendants' conspiracy and retaliation against Skyline reflect their collective efforts to foreclose competition in the markets for the design, manufacture, and sale of Connectors.  They also reflect an effort to push job site owners and contractors away from tried and true steel sheet piling solutions that use Larssen Connectors to sheet and pipe piling systems that use Connectors for which PilePro can charge supracompetitive prices.

73.     In furtherance of Defendants' conspiracy to exclude competition, PilePro has solicited participation in an explicit and elaborate scheme to "establish franchises in global markets via local pipe plants whereby 75% of the steel wall system is sourced locally [i.e., not by Skyline's main sheet piling supplier] and the balance is provided by SWS," led by PilePro.  Ex. F at 4.  Pursuant to this plan to eliminate competition, 100% of the global steel wall piling supply would be provided by either a local PilePro franchisee or PilePro's joint venture, thereby "quickly establish[ing] [SWS] as one of the dominant steel companies in the world."  Ex. F at 14.

23

PilePro's Seven Steel Samurai manifesto explains that "SWS will foster a new type of symbiotic relationship between the steel producer and the marketplace; and this alliance, that is at the heart of SWS, *will be locked into place as a continuous force* — a force to be reckoned with — *not just for one steel deal but for any and all transactions going forward, for decades to come*."  Ex. F at 8 (emphasis added).  The unreasonably restrictive exclusive dealing agreement between PilePro and Plymouth is but one example of the anticompetitive agreements used by Defendants to lock customers into place for all steel deals for years to come.

74.    Some of Skyline's customers request, specify, and prefer Larssen sheet piling systems over those PilePro promotes.  Customers similarly requested and preferred Skyline's more versatile Connectors over PilePro's.  Nonetheless, PilePro and Plymouth have engaged in various anticompetitive acts to harm competitors, such as Skyline, that make competitive Connectors or Larssen sheet piling available to customers that prefer those products over ones for which PilePro can charge supracompetitive prices.  PilePro has sought, through the use of unreasonably restrictive and anticompetitive exclusive dealing arrangements, to cut competitors off from access to extruders, such as Plymouth, in order to increase PilePro's ability to extract monopoly profits, which it can share with Plymouth.  When faced with direct competition, those anticompetitive agreements were used, baseless litigation was filed, and other preemptive actions were enlisted to stamp out market entrants, such as Skyline.

### 1.    PilePro's Baseless Litigation

75.    On or about November 4, 2010, PilePro LLC and PilePro Sales filed a patent infringement lawsuit against Skyline and its then parent company, ArcelorMittal S.A., in the United States District Court for the Eastern District of Texas, Case No. 6:10-cv-587 (the "PilePro Action").  The complaint alleged that Skyline's sales of its own Connectors infringed the PilePro Asserted Patents.  On February 28, 2011, a first amended complaint was filed which asserted

patent infringement claims only as to the '145 Patent and '623 Patent.  Upon information and belief, PilePro LLC is the owner of the PilePro Asserted Patents and PilePro Sales was the exclusive licensee of the PilePro Asserted Patents during the pendency of the PilePro Action. Upon information and belief, PilePro Steel is the successor-in-interest to PilePro Sales' exclusive license in the PilePro Asserted Patents.

76.     Skyline asserted that it never infringed PilePro's patents, and that the PilePro Action was therefore without merit.  In fact, the PilePro Action was a mere sham that was objectively and, on information and belief, subjectively baseless.  No reasonable litigant could have realistically expected to succeed on the merits because the Skyline products accused of infringement clearly did not practice the claims of the PilePro Asserted Patents.

77.     Upon information and belief, PilePro instituted the PilePro Action in an attempt to interfere with Skyline's ability to compete with PilePro in the Connector Markets.

### 2. Plymouth's Initial Refusals to Deal with Skyline, and Its Economically Irrational Behavior But for a Conspiracy, from May Through September 2011

78.     At about the same time that PilePro filed the sham PilePro Action, PilePro engaged in other anticompetitive tactics to force Skyline and its Connectors off the market. Specifically, PilePro interfered with Skyline's ability to manufacture Connectors of its own design and to otherwise compete in the Connector Markets by pressuring Plymouth to stop extruding Connectors for Skyline, thereby eliminating PilePro's only competition for Domestic Connectors.

79.     On May 11, 2011, Plymouth sent a letter to Skyline's Matt Scerbak, Manager of Associated Pile & Fitting, the Skyline subsidiary in charge of sheet piling system "accessories" (including Connectors).  The letter stated that Plymouth could no longer extrude Connectors for

Skyline due to the uncertainty created by the patent litigation as to whether Plymouth was creating shapes for Skyline that were infringing PilePro's patents.

80.     Skyline immediately contacted Plymouth, explaining that the patent litigation was baseless and that none of the products Skyline currently had on order with Plymouth were involved in the lawsuit.  Even so, Plymouth continued to refuse to extrude any more Connectors for Skyline.

81.     Skyline then offered to indemnify Plymouth for any patent claims that might arise pertaining to past, present, or future orders.  Plymouth's and Skyline's legal teams exchanged drafts of an indemnification agreement and appeared to have come to an agreement in principle, at which time Skyline received a call from Plymouth stating that Plymouth would be able to resume extruding Connectors for Skyline.

82.     Relieved to be back in the Connector business, Skyline immediately submitted a purchase order for additional Connectors to Plymouth — only to be told that Plymouth could not accept any new purchase orders from Skyline after all.  When Skyline's attorneys reached out to Plymouth to see what the issue was, they were told that the legal terms of the indemnification were not a problem, but that Plymouth could not deal with Skyline for "business related" reasons.  These so-called "business reasons" were a pretext designed to disguise the PilePro – Plymouth conspiracy.  Faced with the cut-off of its sole supplier for the extrusion of its Domestic Connectors, Skyline attempted to find an alternative domestic extruder of Connectors, but it was unable to do so.

83.     At the time these discussions between Skyline and Plymouth took place, Skyline had already purchased over $500,000 worth of Connectors from Plymouth in 2011 alone.  Plymouth's refusal to deal with Skyline — even with the benefit of a complete indemnity for any

26

past, present, or future patent claims, vetted by its own legal team — was plainly a profit sacrifice that would be economically irrational but for a conspiracy. The economic irrationality was further demonstrated by the fact (later learned by Skyline from McShane, who left Skyline to work for PilePro) that Skyline was paying Plymouth *more* for the manufacture of its Connectors than PilePro had been paying Plymouth for the manufacture of its competing Connectors. Thus, Plymouth cut off a more profitable customer (Skyline) and continued to do business with a then less profitable customer (PilePro), an act that was economically irrational but for a conspiracy with PilePro to eliminate Skyline from the market, after which Plymouth and PilePro could share the monopoly profits.

84.     Plymouth's refusal to deal with Skyline went even beyond a refusal to continue to manufacture Connectors. In or about June 2011, Skyline was approached by an individual from the United States Navy who wished to purchase steel safety rails for use on submarines. The rails would run along the outside of the submarine, enabling workers to clip onto the rails with a harness and move around without fear of falling off. Skyline approached Plymouth to see if it could extrude the rails to the Navy's specifications, and initially received a quote from Plymouth, which Skyline passed on to the Navy. Not long thereafter though, Plymouth changed its mind, without explanation, and informed Skyline that it was unwilling to extrude the steel rails.

85.     Again, Plymouth had no economically rational basis to decline this potential Navy business in the absence of a conspiracy. Indeed, Plymouth's sudden withdrawal of a quote to Skyline cannot be explained on the basis of a shortage of capacity in light of the fact that Plymouth initially indicated that it was capable of completing the job for Skyline and that Plymouth subsequently provided another company with a quote for the same job.

86.     On information and belief, Plymouth's anticompetitive conduct towards Skyline was motivated, at least in part, by a desire to maintain its monopoly over the Domestic Connector Extrusion Market.  Skyline's entry into the market as a competitor to PilePro was a step by Skyline towards vertical integration.  In addition to the engineering services Skyline previously provided to contractors, Skyline sought to vertically integrate the design and production of Connectors into its business in direct competition with PilePro.  Given that Skyline is a subsidiary of a large United States steel company, Plymouth may have viewed Skyline as one of the few companies in the United States that could have acquired the resources to vertically integrate its business even farther by building a mill where Skyline could extrude its own Connectors without having to contract out for those services.  By manufacturing its own Connectors, Skyline could have assured such a mill a steady source of business for Connector extrusion.  By foreclosing Skyline's access to the Connector Markets, Plymouth was able to reduce the economic incentive for Skyline to enter the Domestic Connector Extrusion Market in competition with Plymouth and eliminate a potential competitive threat to its monopoly.

87.     The Connector Markets and the Extrusion Markets have been harmed by Plymouth's refusals to deal with Skyline and the resulting elimination of Skyline as a competitor to PilePro.

### 3.     Settlement of the PilePro Baseless Patent Litigation in October 2011

88.     Although Skyline had already entered the market with its own Connectors, and had sold over $1.6 million of them to customers in only about 15 months, it was now faced with the refusal of the only extruder of Domestic Connectors, Plymouth, to continue to extrude the Connectors for Skyline.  Having cut Skyline off from its only source for domestic extrusion, PilePro was able to coerce Skyline into an anticompetitive Settlement Agreement that required Skyline to stop manufacturing Connectors — including those not accused of patent infringement

28

— in any market.  This was accomplished not only by cutting Skyline off from its only source of domestic extrusion services but also, in part, by misrepresenting to Skyline that PilePro would supply Skyline with "all" Connectors required by Skyline at prices specified in the Settlement Agreement.

89.    Thus, Skyline was coerced by means of Defendants' anticompetitive conduct into settling the PilePro Action with the execution of the Settlement Agreement, dated October 31, 2011.  Under the terms of the Settlement Agreement, PilePro dismissed the PilePro Action without prejudice and provided to Skyline a covenant not to sue for infringement of any of PilePro's patents during the term of the Settlement Agreement, up to October 1, 2018, unless terminated earlier.

90.    In exchange for this covenant not to sue, Skyline was required to discontinue making and selling the Connectors of its own design (after depleting its existing inventory), including Connectors that had never been accused (and could not, in good faith, be accused) of infringing the PilePro Asserted Patents.  Also, with certain limited exceptions, Skyline was required to use PilePro as its sole source for any of its requirements for Connectors, including Connectors not covered by PilePro's patents, in order to gain access to Connectors allegedly covered by the PilePro Asserted Patents.

91.    As of the time of PilePro's litigation and Settlement Agreement, PilePro did not have an objectively or, on information and belief, subjectively reasonable claim that any of Skyline's Connectors, whether or not accused of infringement in the PilePro Action, infringed any of PilePro's patents.

92.     PilePro has thus extended the scope of the patent rights conferred by the PilePro Asserted Patents to eliminate any competition from Skyline in the sale of Connectors, irrespective of whether or not Skyline Connectors were covered by any of PilePro's patents.

93.     Soon after eliminating Skyline as a competitor, PilePro further abused its market power by demanding supracompetitive prices and delaying, or refusing to ship, Connectors, thereby harming competition through both the reduction of output and the inflation of prices above competitive levels.  Within just weeks after settling, PilePro took the surprising and pretextual position that the price list in the Settlement Agreement only applied to Foreign Connectors, even though the Settlement Agreement applied on its face to "all" Connectors and the price list did not distinguish between Domestic and Foreign Connectors.  Thus, not only had PilePro succeeded in stopping Skyline from manufacturing its own Connectors in competition with PilePro, but PilePro had further prevented Skyline from timely providing Connectors purchased from PilePro to Skyline's sheet piling customers, resulting in a loss of customer goodwill, harm to Skyline's business, and harm to Skyline's customers.

94.     Notably, before settling, PilePro's Domestic Connector prices were either comparable to, or less than, prices for similar Foreign Connectors, but after securing the Settlement Agreement, PilePro raised its Domestic Connector prices by *30% or more* above the prices specified in the Settlement Agreement.  These new Domestic Connector prices were also significantly higher than what Skyline had been paying PilePro prior to settling.  Although PilePro must pay freight charges and fees to import its Foreign Connectors from Germany, there has generally been no corresponding 30% increase in Foreign Connector prices.  PilePro's price increases, moreover, cannot be explained by the fact that PilePro has rights to the Asserted Patents.  Putting aside questions of patent non-infringement and invalidity, those patents issued

between 2002 and mid-2010 and thus were in effect long before the Domestic Connector price increases at issue here.  This post-conspiracy disparity between Domestic and Foreign Connector prices for similar Connectors provides strong, economic evidence of Defendants' conspiracy and exertion of market power.

95.     Before Skyline became aware of Defendants' antitrust violations, Skyline considered seeking recourse for PilePro's damaging conduct in an arbitral proceeding under the terms of the Settlement Agreement.  As discussed below, however, Skyline learned of PilePro's exclusive dealing arrangement with Plymouth shortly after serving a Demand for Arbitration, so Skyline took no further steps to commence the arbitration.

### 4.     Discovery of Exclusive Dealing Arrangement Between Defendants

96.     In June 2013, well after the settlement of the patent litigation, Skyline again reached out to Plymouth for price quotes on Connectors.  Not wanting to be accused of violating its obligation created by the Settlement Agreement to purchase most of its Connector requirements directly from PilePro, Skyline limited its request for quotes to Connectors that were explicitly excluded by the Settlement Agreement from its obligation to deal only with PilePro. And in requesting such quotes, Skyline observed to Plymouth that it, Skyline, was not precluded by the Settlement Agreement's terms from having such Connectors extruded by Plymouth.  Once again, however, Plymouth refused to quote, noting that it could not do so "for the foreseeable future."

97.     When Skyline pressed Plymouth for an explanation, Plymouth's General Manager, Kevin Rahnert, emailed Skyline's Matt Scerbak on June 4, 2013:  "Management decision and current contractual agreements prevent us from quoting you at this time." Mr. Scerbak asked when that situation might change, and Mr. Rahnert responded on June 7,

2013: "Our current contract [with PilePro] goes through December 12, 2021. After that date, we would be able to quote."

98.     Until receiving these emails from Mr. Rahnert, Skyline had no confirmation that an exclusive arrangement existed between Plymouth and PilePro, let alone an agreement that covered even Connectors that were excluded from the scope of the Settlement Agreement and that would continue in effect for the next eight years.

99.     Thus, as of the date of this Complaint, the exclusive dealing arrangement between PilePro and Plymouth has more than *eight years* to run. Based on Plymouth's refusals to deal beginning in May 2011, the evidence suggests that the exclusive dealing contract (or some earlier version of such arrangement) was in place since at least that time — making the agreement over *ten years in duration*. Furthermore, because Plymouth refused to provide quotes of any kind, whether for Connectors involved in the patent litigation, Connectors not involved in the patent litigation, or products that are not Connectors at all (i.e., the steel rails for the U.S. Navy), Skyline believes and alleges that the scope of the exclusive dealing agreement has no plausible competitive justification and precludes Plymouth from doing any business with Skyline whatsoever.

100.     Had Skyline known of the conspiracy between Plymouth and PilePro, including the overly broad and exceedingly long exclusive dealing agreement, Skyline would never have entered into the Settlement Agreement. Defendants' anticompetitive exclusive dealing agreement and the Settlement Agreement were formulated by PilePro to work hand-in-hand to completely eliminate competition from Skyline for the design, manufacture, and sale of any and all Domestic Connectors, regardless of whether the Connectors related in any way to the patents involved in PilePro's baseless infringement litigation. Both the exclusive agreement with

Plymouth and the Settlement Agreement were anticompetitive acts in furtherance of Defendants' unlawful conspiracy, as well as anticompetitive acts perpetrated in order to acquire and/or maintain Defendants' respective monopolies in the Connector Markets and the Domestic Connector Extrusion Market.   As such, both agreements should be declared unenforceable against Skyline and as against public policy.

101.   On information and belief, PilePro coerced Plymouth to join the conspiracy by threatening to harm its business through the use of aggressive litigation tactics that PilePro has inflicted on potential and actual competitors, including Skyline and Steelwall, as well as others that have tried to bring PilePro's anticompetitive conduct to light, such as Mark Lenzi (discussed below).  PilePro also enticed Plymouth to join the conspiracy by promising to share some of its monopoly profits with Plymouth, as evidenced by the fact that PilePro's prices to Skyline for Domestic Connectors now exceed its prices for similar Foreign Connectors by 30% or more and, by PilePro's assertion, after the execution of the Settlement Agreement, that its costs for Domestic Connectors (incurred in its dealings with Plymouth) now exceed its costs for similar Foreign Connectors.

### 5.   Other Anticompetitive Acts

#### (a)   PilePro's Unfair and Deceptive Refusal to Supply SWC-120 Connectors to Skyline

102.   In furtherance of Defendants' conspiracy to eliminate competition from Skyline and other companies that promote Larssen sheet piling, PilePro has used anticompetitive and deceptive conduct to eliminate Skyline's opportunity to compete for Open Cell projects in order to favor a competitor that does not promote Larssen sheet piling.  Although Open Cell projects do not themselves use Larssen sheet piling, on information and belief, PilePro has excluded Skyline from these opportunities so that an "alliance" member, L.B. Foster, would have a

competitive advantage over Skyline.  As evidenced by its website, L.B. Foster does not promote Larssen sheet piling, but instead promotes only Ball & Socket and Flat Sheet/Open Cell sheet piling, as well as pipe piling, that use Connectors for which PilePro can charge supracompetitive prices.

103.    PND Engineers, Inc. ("PND") handles the engineering of many large and especially lucrative construction projects.  PND typically uses a particular design for sheet piling in its projects, called an "Open Cell" sheet piling system.   The only kind of Connector compatible with this design, according to the standards set by PND, is a PilePro Connector called the "SWC-120."   Upon information and belief, PilePro is the exclusive manufacturer of the SWC-120, a heavy-duty Connector only manufactured overseas pursuant to an exclusive dealing arrangement.

104.    In order to bid on the sheet piling work for a PND project calling for an Open Cell design, therefore, the bidder must have access to SWC-120 Connectors.  PilePro has either refused to sell SWC-120 Connectors to Skyline or has made the acquisition of such Connectors commercially impracticable.  PilePro's refusal to supply Skyline with the SWC-120 Connector has effectively eliminated Skyline's opportunity to compete for PND's large and highly remunerative public works projects.

105.    During the negotiation of the Settlement Agreement, PilePro represented to Skyline that it was discontinuing the SWC-120 Connector and taking it off the market.  Post-settlement, PilePro represented that it was no longer selling the SWC-120 Connector for use in PND projects, but would sell Skyline what it stated was the new Connector replacing the SWC-120 (the so-called 120 Flat Sheet) for PND projects so that Skyline could compete for those jobs. When Skyline tried to compete for a PND project with the purported replacement 120 Flat Sheet

Connector after executing the Settlement Agreement, however, PND informed Skyline that the Connector PilePro represented as being acceptable to PND was not in fact an approved or tested substitute for the SWC-120 Connector.

106.    Further, although PilePro has restricted Skyline's access to the SWC-120 Connector and had claimed that it stopped supplying this Connector altogether, Skyline's competitor, L.B. Foster, has inexplicably had continual access to the SWC-120 Connector notwithstanding such "discontinuance."  Indeed, L.B. Foster states on its web site that it is fully able to acquire the materials necessary to bid on such jobs, stating "PilePro supplies SWC 120 extruded connectors that insure tight and sure fits in OPEN CELL designs.  L.B. Foster Piling assures material management and timely delivery of the OPEN CELL system to your jobsite." Thus, Skyline has been blocked from PND projects while its competitor wins PND's large-scale projects because it can timely supply the sole Connector approved for PND projects.

107.    More recently, PilePro included the SWC-120 on a price list provided to Skyline, confirming that PilePro had not in fact discontinued this Connector, contrary to its earlier misrepresentations.  When Skyline tried to order these Connectors, however, PilePro raised a number of commercial impediments and refused to make the SWC-120 available to Skyline unless Skyline agreed to divulge certain confidential information relating to the steel pile manufacturing process of its parent company or agreed to purchase Connectors that were specifically calibrated for its competitors' sheet piling.

108.    Although at the time of the Settlement Agreement Skyline was puzzled by this seemingly economically irrational refusal to allow a second reseller to compete for purchases of SWC-120 Connectors, subsequent events reveal this refusal — as well as the exclusive dealing agreement with Plymouth — to be part of a larger, systematic, and anticompetitive conspiracy

led by PilePro to tie up the vertical distribution channels for Connectors through the use of unduly restrictive exclusive dealing arrangements designed to eliminate competition from companies, such as Skyline, that sell Larssen sheet piling systems and Connectors, rather than sheet piling that uses Connectors manufactured exclusively by PilePro.

109.    Thus, PilePro and its conspirators have not only harmed competition in the Connector Markets for the design, manufacture, and supply of Connectors, but have furthermore harmed competition for the supply of sheet piling by foreclosing competition from suppliers selling sheet piling that uses Foreign Connectors sold by PilePro's competitors.

> **(b)    PilePro's Abuse of the Justice System and Unfair and Deceptive Use of the iSheetPile Website to Divert Customers Away From Skyline and Towards Itself in December 2010**

110.    In or about 2009, a computer programmer named Mark Lenzi ("Lenzi") worked with Wendt of PilePro on a website, then called "steelpilingnetwork.com," which customers purportedly could use to determine their sheet piling needs.  PilePro described the "SPN" website in its Seven Steel Samurai manifesto as a place where "many of the questions of calculations and specifications that arise in planning the design of retaining wall systems may be answered via the free online tools available at SPN (as well as the means to order products and arrange for deliveries directly to the job site)."  Customers could enter their specifications, and the website would suggest sheet piling and Connectors for the job.  The website claimed the ability to recommend products from all companies, not only PilePro.

111.    As described in Lenzi's court pleadings, Wendt pressured Lenzi to deliberately skew the algorithm used by SPN so that the website would disproportionately recommend that users purchase PilePro's own O-Pile products.  Lenzi refused, and stopped working with Wendt. Not long thereafter, the website was taken down.  Then, in early December 2010, the website

reappeared as "iSheetPile.com," a self-described "PilePro company," incorporating a skewed algorithm similar to the one that Lenzi had refused to incorporate into the prior version.

112.    At the same time, Wendt retaliated against Lenzi for his refusal to participate in the deceptive scheme by filing a lawsuit through PilePro Sales against not only Lenzi, but also five of Lenzi's family members, seeking, *inter alia*, to enjoin them all from communicating with any customers of PilePro, including Skyline.  The lawsuit ended in settlement, and the iSheetPile website still exists.  The website is unfair and deceptive to consumers, giving the impression that it is a neutral source, when in reality it is designed to maximize the sale of PilePro's own Connectors (for example, by preferring an O-Pile system even when it is less efficient for customers than a Larssen sheet piling system) and to divert customers away from Skyline's products.

113.    Notably, in addition to the baseless litigation filed against Skyline and the threatening tactics PilePro employed by suing Lenzi's family members, PilePro has also retaliated against the only other company in the United States that has attempted to enter the Connector business by filing yet another lawsuit.  In or about 2010, Steelwall, a new Connector company, attempted to enter the Connector market.  Steelwall was unable to break PilePro's monopoly grip on the Domestic Connector market and was unable to gain access to any domestic extrusion services for the purpose of manufacturing Domestic Connectors.   Nonetheless, Steelwall was able to import a limited amount of Connectors from abroad for resale in the United States.  Soon thereafter, PilePro sought to eliminate Steelwall as a competitor altogether by filing a RICO action against both Steelwall and, in their individual capacities, Steelwall's chief executive and other officers and advisors.  Indeed, in its RICO complaint against Steelwall, PilePro explicitly seeks an order prohibiting Steelwall and its co-defendants "*from engaging in*

*the Domestic and International Connector Markets*," defined as the domestic and international markets for steel sheet pile connectors.  Corrected Compl. at 13, 112, *PilePro, LLC v. Chang*, No. 12:cv-00829 SS (W.D. Tex. filed Oct. 11, 2012), ECF No. 7 (emphasis added).  That lawsuit is still pending, and PilePro has issued a broad and wide-ranging subpoena upon Skyline for documents in its efforts to take Steelwall off the market.

**(c)**     **PilePro Poaches Skyline's Key Executive Involved in Entering the Connector Market in August 2011**

114.    As described above, Skyline's Vice President of Engineering, Gerry McShane, was a key player in moving Skyline into the Connector business.  McShane had also been closely involved with the defense of the PilePro patent litigation, and had at the time maintained that PilePro's claims were baseless.

115.    In August 2011, in the midst of the PilePro patent litigation, McShane abruptly resigned from Skyline and joined PilePro Steel as Chief Operating Officer.  Upon McShane's resignation, his email and computer access were removed by Skyline's IT department.  Counsel for ArcelorMittal, then Skyline's parent company, wrote to both McShane and PilePro, reminding them that McShane should not disclose confidential or privileged information obtained during his time at Skyline, and requesting that he return any Skyline documents still in his possession.

116.    Notwithstanding this notification, in or about June 2012, Skyline became aware that McShane had retained a copy of Skyline's customer list, when Skyline's administrative email addresses that had been included on the customer list began to receive emails from PilePro advertising an iSheetPile webinar.  Skyline's marketing department included the email addresses of its own employees on its customer list, in order to receive copies of all materials sent out to customers, but had never provided those email addresses to anyone at PilePro or iSheetPile.  One

of the emails sent by PilePro in June 2012 indicated that it was written by McShane, and touted his past experience as Vice President of Engineering at Skyline.

117.    The customer list that McShane misappropriated was confidential property that Skyline developed over the course of many years, could not be readily duplicated by competitors, and was a competitive asset used by Skyline in the course of promoting, maintaining, and further developing its Connector business.

118.    McShane continues to work at PilePro, giving PilePro the benefit not only of his experience in the Connector industry, but also of his exposure to confidential and privileged information at Skyline, including the confidential and proprietary customer list constituting a competitive asset and trade secret that was misappropriated by McShane.  PilePro can now take advantage of McShane's unique knowledge in order to grow its O-Pile Systems and Connectors business and stamp out competitors such as Skyline.

119.    Upon information and belief, PilePro has used the confidential Skyline customer list to solicit customers away from Skyline.  Skyline has lost at least one job, since McShane's departure, due to PilePro's direct dealings with a Skyline customer.  And very recently, McShane has "suggested" to Skyline that PilePro should, as a matter of course, sell and deliver directly to Skyline's customers.

### 6.    Anticompetitive Effects

120.    The Defendants' anticompetitive acts, including the exclusive dealing agreement between PilePro and Plymouth, have had serious anticompetitive effects on Skyline, and on competition in the Connector Markets and the Extrusion Markets overall, including on other potential market entrants, and on customers.

121.    Skyline has been unable to manufacture its own Connectors for sale to its customers due to Plymouth's refusal to provide extrusion services and due to the Settlement

Agreement with PilePro, which PilePro procured as a result of its conspiracy with Plymouth and by the use of economic duress and false pretenses. Not only has Skyline lost profits and market reputation as a result, but customers have been unable to take advantage of the efficiencies of Skyline's superior range of products.

122. As described above, Skyline's Connectors are far more versatile than PilePro's, with one Skyline Connector replacing up to four PilePro Connectors. Purchasing Skyline Connectors, therefore, enables customers to use less storage space, makes the choice of Connector simpler, allows for easy fixes if a contractor makes a mistake installing the sheet piling at a job site, and provides customers with a product that can easily be used for future jobs if there are Connectors left over.

123. In or about 2012, PilePro began producing a Connector called the "Any-Z," a product that attempts to imitate Skyline's versatile models. However, this Connector is not as efficient or practical as Skyline's Connectors, and, upon information and belief, this Connector is more expensive than Skyline's models.

124. Customers have also been deprived of the convenience and time- and cost-saving benefits associated with Skyline's prior ability to ship sheet piles and Connectors to a job site together. Not only were combined shipments more efficient, but they ensured that customers did not have to wait for Connectors to arrive on site after sheet piling had already arrived to begin a job.

125. The fact that the only domestic extruder commercially offering Connector manufacturing services is in an exclusive dealing arrangement with PilePro also prevents potential entrants from entering the Domestic Connector Market and Domestic Ball & Socket Connector Market. For instance, Steelwall, a relatively new Connector company founded in

2010, has informed Skyline that it has been unable to find a domestic source for extrusion services, and to date has only been able to manufacture Connectors abroad.  Steelwall loses the benefits of being able to sell Domestic Connectors, and customers lose the benefit of having a choice in Domestic Connector producers.

126.   As described above, PilePro's unfair and deceptive refusal to sell SWC-120 Connectors to Skyline has prevented Skyline from bidding on large, lucrative Open Cell construction projects engineered by PND.   Specific lost opportunities to compete include a massive construction project in the Port of Anchorage, Alaska, and construction of a casino in Ohio.  This exclusionary and conspiratorial conduct has harmed not only Skyline, but also PND and its customers, which have been deprived of the benefits of free and fair competition between Skyline and L.B. Foster for the supply of sheet piling, Connectors, and engineering services for Open Cell projects.

127.   Knowing that Skyline has no other source for domestic extrusion services, PilePro has also abused its market power in the Domestic Connector Market and Domestic Ball & Socket Connector Market by charging supracompetitive prices for Domestic Connectors and by reducing market output.  PilePro has used a variety of pretexts to do this, as described below.

128.   When Skyline tried to place its first truckload order of Domestic Connectors shortly after settling, PilePro took the pretextual position that while the Settlement Agreement required Skyline to purchase all Domestic Connectors from PilePro, the listed prices (applicable on the face of the Settlement Agreement to "all" Connectors) inexplicably did not apply to Domestic Connectors.  Rather, PilePro asserted for the first time that the prices applied only to Foreign Connectors, and insisted on a surcharge on Domestic Connectors of 30% or more above such contract prices and above what Skyline has historically paid.  PilePro has attempted to

41

justify the upward deviations from the contract price for Domestic Connectors by asserting that costs of Domestic Connectors have gone up, which suggests that PilePro and Plymouth agreed that Plymouth would increase its prices to PilePro in exchange for Plymouth's agreement to cut Skyline off from the market.

129.    PilePro has also made orders commercially impracticable by demanding a 50% down payment up front on purchase orders that it cannot fill from its inventory, a term nowhere to be found in the Settlement Agreement and not imposed in the past.

130.    In addition to the extracontractual demands with regard to payment, PilePro has also inordinately delayed its shipments, which is contrary to past practice and has exceeded the maximum lead times stated in the Settlement Agreement of between "ten and fourteen weeks." For example, PilePro told Skyline that the lead time for a requested shipment would be approximately 20 weeks.  These delays are commercially unreasonable and harmful to customers who are on tight construction schedules.  More recently, PilePro has demanded even greater surcharges for "quick ship" orders that are represented to be delivered "usually, though not guaranteed, within four business days."  These unusual payment and shipping demands demonstrate that PilePro is discriminating against Skyline in an anticompetitive manner, given that PilePro's marketing materials to all of its other customers expressly state that it can ship within 24 hours for items in stock and within 2-4 days for *all* items, without referencing any increase in price as result.

131.    Specifically, as PilePro states on its website, "PilePro knows immediate access to materials is critical to keep projects on time and budget.  We now offer 24-hour turnaround delivery … across most of the US.  If 24-hour delivery is not available, we can typically get it to

you in 2 to 4 days." PilePro also advertises on its website that there will be "[n]o additional delivery charges."

### C.   Termination of the Settlement Agreement and Steps Taken in Preparation for Arbitration

132.    Shortly before the filing of this Complaint, out of an excess of caution, Skyline notified PilePro that it was invoking the termination provision of the Settlement Agreement, effective immediately, while reserving all of its rights to contend, as it does here, that the Settlement Agreement itself is invalid and unenforceable against Skyline for the reasons set forth herein.

133.    Assuming (contrary to Skyline's position) that the Settlement Agreement was ever valid and enforceable, this termination was proper pursuant to Paragraph B(d) of the Settlement Agreement.  On January 29, 2013, Skyline provided PilePro with written notice of its various breaches, as described above.  To date, PilePro has still failed to cure its breaches, long after the cure period provided by the Settlement Agreement.  Skyline initially attempted to obtain relief for PilePro's refusal to comply with the terms of the Settlement Agreement by engaging in the pre-arbitration negotiation and mediation provided for in the Settlement Agreement, and then taking steps towards the commencement of a JAMS arbitration, as provided by the Settlement Agreement.  Specifically, on May 10, 2013, Skyline served a Demand for Arbitration upon PilePro.  PilePro in turn served its Response and Counterclaim on June 4, 2013.

134.    Three days later, on June 7, 2013, Skyline received confirmation from Plymouth for the first time of its exclusive dealing arrangement with PilePro, not scheduled to expire until December 21, 2021.  Since this disclosure by Plymouth, Skyline has not taken any affirmative steps to advance an arbitration.

135.    Specifically, Skyline has not responded to PilePro's Counterclaim; no arbitrators have been appointed by any party; and Skyline has not paid JAMS' arbitrator management fees. As the JAMS case manager has informed Skyline, pursuant to JAMS rules and policies, an arbitration cannot be deemed "commenced" until the arbitrator management fees are paid and JAMS has issued a formal commencement letter to the parties; neither of these preconditions to commencement of the arbitration have taken place here.  Nor has Skyline made, or been served with, a motion to compel arbitration.  Thus, Skyline has not participated in the arbitration with PilePro.

136.    While the Settlement Agreement contains an arbitration provision in paragraph H, such provision does not survive termination of the Settlement Agreement.  Indeed, the entire dispute resolution paragraph H is expressly limited in duration to the time period "[d]uring the term of this agreement."  Moreover, the provision incorporates "New York statutes governing arbitration," which in turn provide that any disputes as to the validity or enforceability of an agreement containing an arbitration clause shall be determined in the first instance by a court of competent jurisdiction.

137.    Although the Settlement Agreement contains mutual covenants not to sue (so that, for example, PilePro has covenanted not to sue Skyline for infringement of any PilePro patents) the covenant by its terms does not survive the termination of the Settlement Agreement.  Thus, even if the Settlement Agreement were valid and enforceable against Skyline in accordance with its terms (which Skyline disputes), Skyline's termination of such agreement, accomplished before the filing of this Complaint, leaves PilePro able to sue Skyline for alleged patent infringement, including the past alleged infringement in 2010 and 2011, when Skyline was selling its own Connectors.  Thus, a real, immediate, and justiciable controversy now exists

between Skyline and PilePro concerning the non-infringement, unenforceability, and invalidity of the PilePro Asserted Patents. Skyline asserts that it does not infringe and has not infringed the PilePro Asserted Patents, and the PilePro Asserted Patents are invalid and/or unenforceable. PilePro has already sued Skyline once on these very patents. Based on PilePro's filing of the PilePro Action and its dismissal *without* prejudice pursuant to the Settlement Agreement, there is little doubt that, given the termination of the Settlement Agreement by Skyline, PilePro would attempt to enforce its patents against Skyline, including the possible reinstitution of the patent infringement litigation against Skyline under the PilePro Asserted Patents.

138.   PilePro's own actions and words have demonstrated that it has a business model of repeatedly bringing lawsuits on its patents and with respect to its alleged intellectual property against alleged infringers.

139.   Indeed, shortly after the execution of the Settlement Agreement, when PilePro began to breach its terms, representatives from Skyline and PilePro met to discuss a possible business resolution to the disagreements, and at those meetings a PilePro representative told Skyline representatives that if the Settlement Agreement were terminated, PilePro would reinstitute the infringement lawsuit against Skyline. PilePro has issued press releases subsequent to the Settlement Agreement announcing that "PilePro will continue to pursue vigorously any person or entity that attempts to misappropriate its intellectual property or business assets."

140.   Real, immediate, and justiciable controversies also exist between Skyline and PilePro concerning whether PilePro's patents are enforceable against Skyline and whether the Settlement Agreement was ever valid and enforceable, given PilePro's antitrust violations and patent misuse described herein. PilePro used the PilePro Asserted Patents to obtain the Settlement Agreement that improperly expanded the scope of PilePro's patents by requiring that

Skyline (1) cease producing Connectors that were not accused, and could not reasonably be accused, of infringing the PilePro Asserted Patents or any of PilePro's other patents; and (2) fulfill virtually all of its requirements for Connectors by purchasing them from PilePro, even if the Connectors were not covered by PilePro's patents.  The supposed benefit flowing to Skyline for the Settlement Agreement was PilePro's covenant not to sue Skyline for infringement of the PilePro Asserted Patents, but Skyline did not infringe any valid and enforceable patent claim of PilePro.  Based on the PilePro Action and its dismissal without prejudice pursuant to the Settlement Agreement, there is little doubt that PilePro would attempt to enforce the Settlement Agreement against Skyline or reinstitute patent infringement litigation under the PilePro Asserted Patents given Skyline's termination of the Settlement Agreement.

141.    A substantial controversy of sufficient immediacy and reality exists between the parties that warrants the issuance of a declaratory judgment.

## CAUSES OF ACTION

### COUNT ONE
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Against PilePro Sales, PilePro Steel, and Plymouth)**

142.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 141 as if fully set forth herein.

143.    PilePro and Plymouth have entered into continuing illegal agreements and understandings which have unreasonably restrained trade, the purpose and effect of which are to eliminate competition in the Domestic Connector Market, Ball & Socket Connector Market, Domestic Ball & Socket Connector Market, Domestic Connector Extrusion Market, and Domestic Steel Extrusion Market, among others, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

46

144.   PilePro and Plymouth have entered into a formal exclusive dealing agreement of unreasonable breadth and duration that is part of a larger, systematic, and anticompetitive conspiracy to tie up the vertical distribution channels for Connectors by creating a web of such unduly restrictive exclusive dealing arrangements.  Based on PilePro's own statements, these agreements are intended to eliminate competition from companies like Skyline and to force customers to purchase certain types of sheet piling that use Connectors that are manufactured exclusively by PilePro.  To this end, PilePro and Plymouth have not only harmed competition for the design, manufacture, and sale of Connectors, but have furthermore harmed competition for the supply of sheet piling.

145.   The anticompetitive effects of Defendants' anticompetitive conduct far outweigh any purportedly procompetitive justifications.  Even if such a justification existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

146.   As a direct, foreseeable, and proximate result of Defendants' anticompetitive actions, Skyline has been injured in its business in that, without limitation, it has been completely foreclosed from the opportunity to compete for the design and manufacture of Connectors and other steel products extruded in the United States; has lost profits on sales of Connectors of Skyline's own design and other extruded steel products; has been charged and has paid supracompetitive Connector prices; has suffered the diminution of value of Skyline's sheet piling systems business; has lost the opportunity to compete to supply sheet piling systems, thereby losing profits for both the sheet piling and Connectors; and has lost customer goodwill as a result of PilePro's refusal to provide Connectors in a professional and timely manner; all with resultant damages in amounts to be proven at trial.

147.   As a direct, foreseeable, and proximate result of Defendants' anticompetitive actions, competition and customers in the Domestic Connector Market, Ball & Socket Connector Market, Domestic Ball & Socket Connector Market, Domestic Connector Extrusion Market, and Domestic Steel Extrusion Market have been harmed by the elimination of Skyline as a competitor, which completely foreclosed Skyline's ability to continue manufacturing a superior line of domestic Connectors or any other domestic steel products desired by customers.  Having removed Skyline as a competitor, PilePro and Plymouth have abused their market power by charging supracompetitive prices, reducing market output, and reducing consumer choice, including depriving consumers of fair and timely access to Skyline's innovative and versatile Connectors.

**COUNT TWO**
**Anticompetitive Exclusive Dealing**
**Violation of Sections 1 & 2 of the Sherman Act, 15 U.S.C. §§ 1, 2,**
**(Against PilePro Sales, PilePro Steel, and Plymouth)**

148.   Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 147 as if fully set forth herein.

149.   PilePro and Plymouth entered into a formal agreement of unreasonable breadth and duration that foreclosed Skyline from selling any and all Connectors extruded in the United States.  This agreement, which cut Skyline off from its only source for Domestic Connector extrusion services, is unreasonably long in that it extends through December 12, 2021, and is unreasonably broad in that it prohibits Plymouth from extruding *all* Connectors or *any other type of product* for Skyline.  Such an unreasonable restraint cannot be justified by any purportedly procompetitive virtues.  Rather, this agreement was forged in retaliation for Skyline's attempt to compete with PilePro for the design and manufacture of Connectors; is against Plymouth's rational economic self-interest but for a conspiracy to eliminate competition and share monopoly

48

profits; and was completed in furtherance of Defendants' unlawful conspiracy in order to maintain their respective monopolies. Defendants' agreement unreasonably restrains trade in the Domestic Connector Market, Ball & Socket Connector Market, Domestic Ball & Socket Connector Market, Domestic Connector Extrusion Market, and Domestic Steel Extrusion Market, among others, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

150.    Defendants' agreement also violates Section 2 of the Sherman Act, 15 U.S.C. § 2, because it constitutes an anticompetitive act completed in order to maintain Defendants' respective monopolies over the Domestic Connector Market, Ball & Socket Connector Market, Domestic Ball & Socket Connector Market, and Domestic Connector Extrusion Market. As detailed above, PilePro has market power in the Domestic Connector Market and submarkets and the Ball & Connector Market, including the power to control prices and exclude competition, and Plymouth has market power in the Domestic Connector Extrusion Market, including the power to control prices and exclude competition.

151.    The anticompetitive effects of Defendants' exclusionary agreement far outweigh any purportedly procompetitive justifications. For example, as set forth above, it is evident from Plymouth's words and actions that the term of the agreement is in excess of at least eight years, and that the agreement covers not only Connectors that are exempt from Skyline's obligations to purchase from PilePro, but also extruded steel products that are not even Connectors (e.g., the safety rail for the U.S. Navy). Even if any procompetitive justification existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

152.    As a direct, foreseeable, and proximate result of Defendants' anticompetitive exclusive dealing agreement, Skyline has been injured in its business in that, without limitation, it has been completely foreclosed from the opportunity to compete for the design and

49

manufacture of Connectors and other steel products extruded in the United States; has lost profits on sales of Connectors of Skyline's own design and other extruded steel products; has been charged and has paid supracompetitive Connector prices; has suffered the diminution of value of Skyline's sheet piling systems business; and has lost customer goodwill as a result of PilePro's refusal to provide Connectors in a professional and timely manner; all with resultant damages in amounts to be proven at trial.

153.     As a direct, foreseeable, and proximate result of Defendants' anticompetitive exclusive dealing agreement, competition and customers in the Domestic Connector Market, Ball & Socket Connector Market, Domestic Ball & Socket Connector Market, Domestic Connector Extrusion Market, and Domestic Steel Extrusion Market have been harmed by the elimination of Skyline as a competitor, which completely foreclosed Skyline's ability to continue manufacturing a superior line of Domestic Connectors or any other domestic steel products desired by customers.  Having removed Skyline as a competitor, PilePro and Plymouth have abused their market power by charging supracompetitive prices, reducing market output, and reducing customer choice, including depriving customers of fair and timely access to Skyline's innovative and versatile Connectors.

**COUNT THREE**
**Concerted Refusals to Deal**
**Violation of Section 1 of the Sherman Act, 15 U.S.C. § 1**
**(Against PilePro Sales, PilePro Steel, and Plymouth)**

154.     Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 153 as if fully set forth herein.

155.     Defendants have collectively refused to deal with Skyline, thereby harming the Domestic Connector Market, Ball & Socket Connector Market, Domestic Ball & Socket

Connector Market, Domestic Connector Extrusion Market, and Domestic Steel Extrusion Market, in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1.

156.    The anticompetitive effects of Defendants' concerted refusals to deal far outweigh any purportedly procompetitive justifications.  Even if such justification existed, any possible procompetitive benefits could have been obtained by less restrictive alternatives.

157.    As a direct, foreseeable, and proximate result of Defendants' concerted refusals to deal, Skyline has been injured in its business in that, without limitation, it has been completely foreclosed from the opportunity to compete for the design and manufacture of Connectors and other steel products extruded in the United States; has lost profits on sales of Connectors of Skyline's own design and other extruded steel products; has been charged and has paid supracompetitive Connector prices; has suffered the diminution of value of Skyline's sheet piling systems business; and has lost customer goodwill as a result of PilePro's refusal to provide Connectors in a professional and timely manner; all with resultant damages in amounts to be proven at trial.

158.    As a direct, foreseeable, and proximate result of Defendants' concerted refusals to deal, competition and customers in the Domestic Connector Market, Ball & Socket Connector Market, Domestic Ball & Socket Connector Market, Domestic Connector Extrusion Market, and Domestic Steel Extrusion Market have been harmed by the elimination of Skyline as a competitor, which completely foreclosed Skyline's ability to continue manufacturing a superior line of Domestic Connectors or any other domestic steel products desired by customers.  Having removed Skyline as a competitor, PilePro and Plymouth have abused their market power by charging supracompetitive prices, reducing market output, and reducing consumer choice,

51

including depriving consumers of fair and timely access to Skyline's innovative and versatile Connectors.

## COUNT FOUR
### Monopolization
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### (Against PilePro Sales/PilePro Steel)

159.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 158 as if fully set forth herein.

160.    As detailed above, PilePro has market power in the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market, including the power to control prices and exclude competition.

161.    As alleged herein, PilePro has engaged in anticompetitive conduct in order to unlawfully acquire and/or maintain PilePro's monopoly in the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

162.    PilePro has unlawfully excluded competition from a significant and substantial portion of the Ball & Socket Connector Market; has eliminated competition in the Domestic Connector Market and the Domestic Ball & Socket Connector Market; and has unlawfully acquired and/or maintained its dominant control over the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market.  PilePro has profited from its anticompetitive conduct by charging supracompetitive prices and by otherwise reaping the benefits of its unlawfully maintained market power in the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market.

163.     As a direct, foreseeable, and proximate result of PilePro's anticompetitive and monopolistic conduct, Skyline has been injured in its business in that, without limitation, it has been completely foreclosed from the opportunity to compete for the design and manufacture of Connectors and other steel products extruded in the United States; has lost profits on sales of Connectors of Skyline's own design and other extruded steel products; has been charged and has paid supracompetitive Connector prices; has suffered the diminution of value of Skyline's sheet piling systems business; has lost the opportunity to compete to supply sheet piling systems, thereby losing profits for both the sheet piling and Connectors; and has lost customer goodwill as a result of PilePro's refusal to provide Connectors in a professional and timely manner; all with resultant damages in amounts to be proven at trial.

164.     As a direct, foreseeable, and proximate result of PilePro's anticompetitive and monopolistic conduct, competition and customers in the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market have been harmed by the elimination of Skyline as a competitor, which completely foreclosed Skyline's ability to continue manufacturing a superior line of Domestic Connectors.  Having removed Skyline as a competitor, PilePro has abused its market power by charging supracompetitive prices, reducing market output, and reducing consumer choice, including depriving consumers of fair and timely access to Skyline's innovative and versatile Connectors.

**COUNT FIVE**
**Attempted Monopolization**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Against PilePro Sales/PilePro Steel)**

165.     Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 164 as if fully set forth herein.

166.    As detailed above, PilePro has market power in the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market, including the power to control prices and exclude competition.

167.    PilePro has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

168.    PilePro's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market.  PilePro's anticompetitive conduct presents a dangerous probability that PilePro will succeed, to the extent it has not already, in its attempt to monopolize the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market.

169.    As a direct, foreseeable, and proximate result of PilePro's anticompetitive and monopolistic conduct, Skyline has been injured in its business in that, without limitation, it has been completely foreclosed from the opportunity to compete for the design and manufacture of Connectors and other steel products extruded in the United States; has lost profits on sales of Connectors of Skyline's own design and other extruded steel products; has been charged and has paid supracompetitive Connector prices; has suffered the diminution of value of Skyline's sheet piling systems business; has lost the opportunity to compete to supply sheet piling systems, thereby losing profits for both the sheet piling and Connectors; and has lost customer goodwill as

a result of PilePro's refusal to provide Connectors in a professional and timely manner; all with resultant damages in amounts to be proven at trial.

170.     As a direct, foreseeable, and proximate result of PilePro's anticompetitive and monopolistic conduct, competition and customers in the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Connector Market have been harmed by the elimination of Skyline as a competitor, which completely foreclosed Skyline's ability to continue manufacturing a superior line of Domestic Connectors.  Having removed Skyline as a competitor, PilePro has abused its market power by charging supracompetitive prices, reducing market output, and reducing consumer choice, including depriving consumers of fair and timely access to Skyline's innovative and versatile Connectors.

**COUNT SIX**
**Monopolization**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Against Plymouth)**

171.     Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 170 as if fully set forth herein.

172.     As detailed above, Plymouth has market power in the Domestic Connector Extrusion Market, including the power to control prices and exclude competition.

173.     As alleged herein, Plymouth has engaged in anticompetitive conduct  in order to unlawfully maintain Plymouth's monopoly in the Domestic Connector Extrusion Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

174.     Plymouth has effectively excluded competition from the Domestic Connector Extrusion Market by foreclosing Skyline's access to the Connector Markets, thereby reducing the economic incentive for Skyline to enter the Domestic Connector Extrusion Market in competition with Plymouth; unlawfully maintained its dominant control over the Domestic

Connector Extrusion Market; and profited from its anticompetitive conduct by charging supracompetitive prices and by otherwise reaping the benefits of its unlawfully maintained monopoly in the Domestic Connector Extrusion Market. Indeed, PilePro has represented that its costs for Connectors manufactured domestically are higher than its costs for Connectors manufactured in Germany, despite the additional costs required to import such Connectors from abroad, demonstrating that Plymouth has exerted its market power by charging supracompetitive prices.

175.    As a direct, foreseeable, and proximate result of Plymouth's anticompetitive and monopolistic conduct, Skyline has been injured in its business in that, without limitation, it has been completely foreclosed from the opportunity to compete for the design and manufacture of Connectors and other steel products extruded in the United States; has lost profits on sales of Connectors of Skyline's own design and other extruded steel products; has been charged and has paid supracompetitive Connector prices; has suffered the diminution of value of Skyline's sheet piling systems business; and has lost customer goodwill; all with resultant damages in amounts to be proven at trial.

176.    As a direct, foreseeable, and proximate result of Plymouth's anticompetitive and monopolistic conduct, competition and customers in the Domestic Connector Extrusion Market have been harmed by the elimination of Skyline as a competitor, which completely foreclosed Skyline's ability to continue manufacturing a superior line of Domestic Connectors. Having removed Skyline as a competitor, Plymouth has abused its market power by reducing its output, charging supracompetitive prices, and reducing customer choice, including depriving customers of fair and timely access to Skyline's versatile Connectors, thereby sharing monopoly profits with PilePro.

**COUNT SEVEN**
**Attempted Monopolization**
**Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2**
**(Against Plymouth)**

177.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 176 as if fully set forth herein.

178.    As detailed above, Plymouth has monopoly market power in the Domestic Connector Extrusion Market, including the power to control prices and exclude competition.

179.    Plymouth has willfully, knowingly, and with specific intent to do so, attempted to monopolize the Domestic Connector Extrusion Market, in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2.

180.    Plymouth's anticompetitive conduct alleged herein has been directed at accomplishing the unlawful objective of controlling prices and/or preventing competition in the Domestic Connector Extrusion Market.   Plymouth's anticompetitive conduct presents a dangerous probability that Plymouth will succeed, to the extent it has not already, in its attempt to monopolize the Domestic Connector Extrusion Market.

181.    As a direct, foreseeable, and proximate result of Plymouth's anticompetitive and monopolistic conduct, Skyline has been injured in its business in that, without limitation, it has been completely foreclosed from the opportunity to compete for the design and manufacture of Connectors and other steel products extruded in the United States; has lost profits on sales of Connectors of Skyline's own design and other extruded steel products; has been charged and has paid supracompetitive Connector prices; has suffered the diminution of value of Skyline's sheet piling systems business; and has lost customer goodwill; all with resultant damages in amounts to be proven at trial.

182.     As a direct, foreseeable, and proximate result of Plymouth's anticompetitive and monopolistic conduct, competition and customers in the Domestic Connector Extrusion Market have been harmed by the elimination of Skyline as a competitor, which completely foreclosed Skyline's ability to continue manufacturing a superior line of Domestic Connectors.  Having removed Skyline as a competitor, Plymouth has abused its market power by reducing its output, charging supracompetitive prices, and reducing customer choice, including depriving customers of fair and timely access to Skyline's versatile Connectors, thereby sharing monopoly profits with PilePro.

## COUNT EIGHT
### Violation of New Jersey Antitrust Act, N.J.S.A. 56:9-3
### (Against PilePro Sales, PilePro Steel, and Plymouth)

183.     Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 182 as if fully set forth herein.

184.     Skyline repeats and reasserts each of the allegations contained in Counts One, Two, and Three as if fully set forth herein.

185.     The anticompetitive conduct alleged herein also constitutes a violation of the NJAA, N.J.S.A. 56:9-3, which prohibits "[e]very contract, combination in the form of trust or otherwise, or conspiracy in restraint of trade or commerce" in the State of New Jersey.

## COUNT NINE
### Violation of New Jersey Antitrust Act, N.J.S.A. 56:9-4(a)
### (Against PilePro Sales/PilePro Steel)

186.     Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 185 as if fully set forth herein.

187.     Skyline repeats and reasserts each of the allegations contained in Counts Two, Four, and Five as if fully set forth herein.

58

188.    The anticompetitive conduct alleged herein also constitutes a violation of the NJAA, N.J.S.A. 56:9-4(a), which makes it "unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State."

**COUNT TEN**
**Violation of New Jersey Antitrust Act, N.J.S.A. 56:9-4(a)**
**(Against Plymouth)**

189.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 188 as if fully set forth herein.

190.    Skyline repeats and reasserts each of the allegations contained in Counts Two, Six, and Seven as if fully set forth herein.

191.    The anticompetitive conduct alleged herein also constitutes a violation of the NJAA, N.J.S.A. 56:9-4(a), which makes it "unlawful for any person to monopolize, or attempt to monopolize, or to combine or conspire with any person or persons, to monopolize trade or commerce in any relevant market within this State."

**COUNT ELEVEN**
**New Jersey Common Law Unfair Competition**
**(Against PilePro LLC, PilePro Sales, PilePro Steel, and Plymouth)**

192.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 191 as if fully set forth herein.

193.    On information and belief, Defendants engaged in the activities alleged herein for the purpose and with the intent of injuring Skyline's business and property in New Jersey.

194.    All of Defendants' unlawful and anticompetitive actions as alleged herein are unfair, immoral, unethical, oppressive, unscrupulous, and/or substantially injurious to consumers.

59

195.    All of the acts, practices, and policies of Defendants as alleged herein are unfair methods of competition and/or unfair competition under the common law of the State of New Jersey, including, but not limited to:

a.    PilePro's unlawful institution of the PilePro Action which was objectively and subjectively baseless;

b.    Plymouth's unlawful and concerted refusals to manufacture Connectors and steel rails for Skyline;

c.    Defendants' unlawful exclusive dealing agreement of unreasonable breadth and duration;

d.    PilePro's unfair and deceptive refusal to supply SWC-120 Connectors to Skyline and representations that the sale of such connectors was being discontinued; and

e.    PilePro's unfair and deceptive use of the iSheetPile website to divert customers, including New Jersey customers, away from Skyline.

196.    As a direct, foreseeable, and proximate result of Defendants' anticompetitive actions, Skyline has been injured in its business in that, without limitation, it has been completely foreclosed from the opportunity to compete for the design and manufacture of Connectors and other steel products extruded in the United States; has lost profits on sales of Connectors of Skyline's own design and other extruded steel products; has been charged and has paid supracompetitive Connector prices; has suffered the diminution of value of Skyline's sheet piling systems business; has lost the opportunity to compete to supply sheet piling systems, thereby losing profits for both the sheet piling and Connectors; and has lost customer goodwill as a result

of PilePro's refusal to provide Connectors in a professional and timely manner; all with resultant damages in amounts to be proven at trial.

197.     As a direct, foreseeable, and proximate result of Defendants' anticompetitive actions, competition and customers in the Domestic Connector Market, Ball & Socket Connector Market, Domestic Ball & Socket Connector Market, Domestic Connector Extrusion Market, and Domestic Steel Extrusion Market have been harmed by the elimination of Skyline as a competitor, which completely foreclosed Skyline's ability to continue manufacturing a superior line of Domestic Connectors or any other domestic steel products desired by customers.  Having removed Skyline as a potential competitor, PilePro and Plymouth have abused their market power by charging supracompetitive prices, reducing output, and reducing consumer choice, including depriving consumers of fair and timely access to Skyline's versatile Connectors.

<u>**COUNT TWELVE**</u>
**Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,390,145**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

198.     Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 197 as if fully set forth herein.

199.     Skyline has not directly infringed and does not directly infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '145 Patent.

200.     Skyline has not indirectly infringed and does not indirectly infringe any valid and enforceable claim of the '145 Patent, either by inducing infringement or contributory infringement.

201.     Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that no valid and enforceable claim of the '145 Patent is infringed by Skyline.

**COUNT THIRTEEN**
**Declaratory Judgment of Non-Infringement of U.S. Patent No. 7,753,623**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

202.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 201 as if fully set forth herein.

203.    Skyline has not directly infringed and does not directly infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '623 Patent.

204.    Skyline has not indirectly infringed and does not indirectly infringe any valid and enforceable claim of the '623 Patent, either by inducing infringement or contributory infringement.

205.    Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that no valid and enforceable claim of the '623 Patent is infringed by Skyline.

**COUNT FOURTEEN**
**Declaratory Judgment of Non-Infringement of U.S. Design Patent No. D465,288**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

206.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 205 as if fully set forth herein.

207.    Skyline has not directly infringed and does not directly infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '288 Patent.

208.    Skyline has not indirectly infringed and does not indirectly infringe any valid and enforceable claim of the '288 Patent, either by inducing infringement or contributory infringement.

209.    Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that no valid and enforceable claim of the '288 Patent is infringed by Skyline.

## COUNT FIFTEEN
**Declaratory Judgment of Non-Infringement of U.S. Design Patent No. D621,245**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

210.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 209 as if fully set forth herein.

211.    Skyline has not directly infringed and does not directly infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '245 Patent.

212.    Skyline has not indirectly infringed and does not indirectly infringe any valid and enforceable claim of the '245 Patent, either by inducing infringement or contributory infringement.

213.    Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that no valid and enforceable claim of the '245 Patent is infringed by Skyline.

## COUNT SIXTEEN
**Declaratory Judgment of Non-Infringement of U.S. Design Patent No. D622,579**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

214.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 213 as if fully set forth herein.

215.    Skyline has not directly infringed and does not directly infringe, either literally or under the doctrine of equivalents, any valid and enforceable claim of the '579 Patent.

216.    Skyline has not indirectly infringed and does not indirectly infringe any valid and enforceable claim of the '579 Patent, either by inducing infringement or contributory infringement.

217.    Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that no valid and enforceable claim of the '579 Patent is infringed by Skyline.

**COUNT SEVENTEEN**
**Declaratory Judgment of Invalidity of U.S. Patent No. 7,390,145**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

218.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 217 as if fully set forth herein.

219.    One or more claims of the '145 Patent are invalid for failure to satisfy one or more of the conditions of patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and 112.

220.    Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that one or more claims of the '145 Patent are invalid.

**COUNT EIGHTEEN**
**Declaratory Judgment of Invalidity of U.S. Patent No. 7,753,623**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

221.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 220 as if fully set forth herein.

222.    One or more claims of the '623 Patent are invalid for failure to satisfy one or more of the conditions of patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 101, 102, 103, and 112.

223.    Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that one or more claims of the '623 Patent are invalid.

**COUNT NINETEEN**
**Declaratory Judgment of Invalidity of U.S. Design Patent No. D465,288**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

224.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 223 as if fully set forth herein.

225.     The '288 Patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 102, 103, 112, and 171.

226.     Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that the '288 Patent is invalid.

**COUNT TWENTY**
**Declaratory Judgment of Invalidity of U.S. Design Patent No. D621,245**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

227.     Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 226 as if fully set forth herein.

228.     The '245 Patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 102, 103, 112, and 171.

229.     Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that the '245 Patent is invalid.

**COUNT TWENTY-ONE**
**Declaratory Judgment of Invalidity of U.S. Design Patent No. D622,579**
**(Against PilePro LLC, PilePro Sales, and PilePro Steel)**

230.     Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 229 as if fully set forth herein.

231.     The '579 Patent is invalid for failure to satisfy one or more of the conditions of patentability set forth in Title 35 of the United States Code, including, but not limited to, 35 U.S.C. §§ 102, 103, 112, and 171.

232.     Accordingly, Skyline seeks a declaratory judgment pursuant to 28 U.S.C. §§ 2201 and 2202 that the '579 Patent is invalid.

## COUNT TWENTY-TWO
### Sham Litigation
### Violation of Section 2 of the Sherman Act, 15 U.S.C. § 2
### (Against PilePro LLC and PilePro Sales)

233.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 232 as if fully set forth herein.

234.    In the PilePro Action, PilePro LLC and PilePro Sales asserted that Skyline's APF-T-Pile, SKPT, APF-BPF, SKPF, APF-BPM, and SKPM Sheet Piling Connectors infringe the PilePro Asserted Patents.

235.    There was no objectively reasonable basis for the claims asserted in the PilePro Action.  No reasonable litigant could realistically have expected to succeed on the merits of the PilePro Action because the Skyline Connectors accused of infringement clearly did not practice the claims of the PilePro Asserted Patents.

236.    Upon information and belief, PilePro LLC and PilePro Sales's institution of the PilePro Action was subjectively baseless in that the action was an attempt to interfere with Skyline's ability to compete with PilePro for the sale of domestically produced Sheet Piling Connectors.  And PilePro filed its sham litigation in a district without any meaningful connection to any of the parties, where neither PilePro nor Skyline had any offices, employees or relevant documents, as another tactic to coerce a settlement of its baseless litigation.

237.    As a result of the sham PilePro Action, Skyline was compelled to abandon the manufacture of its own Connectors, even those which were not accused of infringing the PilePro Asserted Patents, and to agree to purchase virtually all of its Connectors, even those not covered by the PilePro Asserted Patents, from PilePro.  Competition in the Connector Markets has thus been harmed.

66

## COUNT TWENTY-THREE
### Patent Misuse
### (Against PilePro LLC, PilePro Sales, and PilePro Steel)

238.    Skyline repeats and reasserts each of the allegations contained in paragraphs 1 through 237 as if fully set forth herein.

239.    The PilePro Action alleged that Skyline infringed the PilePro Asserted Patents by making, using, and selling Connector models APF-T-Pile, SKPT, APF-BPF, SKPF, APF-BPM, and SKPM, a mere fraction of Skyline's entire product line of Connectors.

240.    In order to gain access to Connectors allegedly covered by the PilePro Asserted Patents, PilePro required that Skyline agree to the following terms:

      a.    cease producing its own Connectors, including Connectors which were not accused, and could not reasonably be accused, of infringing the PilePro Asserted Patents or any of PilePro's other patents; and

      b.    fulfill virtually all of its requirements for Connectors by purchasing them from PilePro, even if the Connectors are not covered by PilePro's patents.

241.    PilePro has thus broadened the scope of the PilePro Asserted Patents by obtaining market power in the Connector Markets, including for Connectors which do not arguably infringe the PilePro Asserted Patents or any of PilePro's other patents.

242.    Competition in the Connector Markets has been harmed because PilePro's patent misuse has eliminated its sole competitor, Skyline, from the market, and consumers no longer have access to Skyline's superior line of Connectors.

**PRAYER FOR RELIEF**

WHEREFORE, Skyline demands a trial by jury and hereby respectfully requests:

1.      Pursuant to 28 U.S.C. § 2201, a declaration that Defendants have unreasonably restrained trade in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1, and NJAA, N.J.S.A. 56:9-3;

2.      Pursuant to 28 U.S.C. § 2201, a declaration that Defendants' exclusive dealing agreement is an unreasonable and unenforceable restraint of trade that violates Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1, 2, and NJAA, N.J.S.A. 56:9-3, 9-4(a);

3.      Pursuant to 28 U.S.C. § 2201, a declaration that PilePro has monopolized, or in the alternative, attempted to monopolize, the Domestic Connector Market, the Ball & Socket Connector Market, and the Domestic Ball & Socket Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and NJAA, N.J.S.A. 56:9-4(a);

4.      Pursuant to 28 U.S.C. § 2201, a declaration that Plymouth has monopolized, or in the alternative, attempted to monopolize, the Domestic Connector Extrusion Market in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 and NJAA, N.J.S.A. 56:9-4(a);

5.      Pursuant to 28 U.S.C. § 2201, a declaration that the PilePro Action was a baseless, sham litigation in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2;

6.      Pursuant to 28 U.S.C. § 2201, a declaration that the Settlement Agreement constitutes patent misuse and that the Settlement Agreement and all patents covered by the agreement are unenforceable;

7.      Pursuant to 28 U.S.C. § 2201, a declaration that the Settlement Agreement is unenforceable, invalid, and void as against public policy;

8.      Pursuant to 15 U.S.C. § 15, trebled damages resulting from Defendants' violations of the Sherman Act;

9.      Pursuant to 15 U.S.C. § 26, injunctive relief preventing Defendants from continuing the unlawful acts in violation the Sherman Act;

10.     Pursuant to 15 U.S.C. § 26, injunctive relief preventing and restraining PilePro from enforcing the Settlement Agreement;

11.     Pursuant to N.J.S.A. 56:9-12, trebled damages resulting from Defendants' violations of the NJAA;

12.     Pursuant to N.J.S.A. 56:9-10, injunctive relief preventing Defendants from continuing the unlawful acts in violation of the NJAA;

13.     Pursuant to New Jersey common law, an award of compensatory damages sustained by Skyline as a proximate result of Defendants' unfair and anticompetitive acts and such further injunctive or equitable relief as may be necessary and proper;

14.     Pursuant to 28 U.S.C. § 2201, a declaration that that no valid and enforceable claim of the '145 Patent is infringed by Skyline;

15.     Pursuant to 28 U.S.C. § 2201, a declaration that no valid and enforceable claim of the '623 Patent is infringed by Skyline;

16.     Pursuant to 28 U.S.C. § 2201, a declaration that no valid and enforceable claim of the '288 Patent is infringed by Skyline;

17.     Pursuant to 28 U.S.C. § 2201, a declaration that no valid and enforceable claim of the '245 Patent is infringed by Skyline;

18.     Pursuant to 28 U.S.C. § 2201, a declaration that no valid and enforceable claim of the '579 Patent is infringed by Skyline;

19.     Pursuant to 28 U.S.C. § 2201, a declaration that the '145 Patent is invalid;

20.     Pursuant to 28 U.S.C. § 2201, a declaration that the '623 Patent is invalid;

69

21.     Pursuant to 28 U.S.C. § 2201, a declaration that the '288 Patent is invalid;

22.     Pursuant to 28 U.S.C. § 2201, a declaration that the '245 Patent is invalid;

23.     Pursuant to 28 U.S.C. § 2201, a declaration that the '579 Patent is invalid;

24.     Pursuant to 28 U.S.C. § 2202, such further relief as may be necessary or proper based upon this Court's declaratory judgments;

25.     An order staying the Skyline/PilePro arbitration (JAMS Arbitration Ref. # 1425013730) pending the outcome of this action;

26.     Pre-judgment and post-judgment interest at the maximum legal rate;

27.     Plaintiff's costs, expenses, and reasonable attorneys' fees in bringing this action;

28.     Plaintiff's costs, expenses, and reasonable attorneys' fees in defending against PilePro's sham litigation and the subsequent proceedings in anticipation of the commencement of an arbitration under the Settlement Agreement; and

29.     Such other relief as this Court may deem just and proper.


Dated: August 15, 2013                    WINSTON & STRAWN LLP
                                          *Attorneys for Plaintiff Skyline Steel, LLC*

                                          By:  ___s/ James S. Richter_____
**OF COUNSEL:**                                James S. Richter
                                               jrichter@winston.com
Aldo A. Badini                                 Melissa Steedle Bogad
Peter Lambrianakos                             mbogad@winston.com
Susannah P. Torpey
Margaret Ciavarella
Brandon W. Duke
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
abadini@winston.com
plambrianakos@winston.com
storpey@winston.com

mciavarella@winston.com
bduke@winston.com

Diana L. Hughes
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111-5802
(415) 591-1000
dhughes@winston.com

Jay L. Lazar
1655 Valley Center Parkway, Suite 200
Bethlehem, Pennsylvania 18017
(610) 694-2558

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff Skyline hereby demands a trial by jury.

Dated: August 15, 2013

WINSTON & STRAWN LLP
*Attorneys for Plaintiff Skyline Steel, LLC*

By:   s/ James S. Richter
_____
      James S. Richter
      jrichter@winston.com
      Melissa Steedle Bogad
      mbogad@winston.com

**OF COUNSEL:**

Aldo A. Badini
Peter Lambrianakos
Susannah P. Torpey
Margaret Ciavarella
Brandon W. Duke
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
abadini@winston.com
plambrianakos@winston.com
storpey@winston.com
mciavarella@winston.com
bduke@winston.com

Diana L. Hughes
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111-5802
(415) 591-1000
dhughes@winston.com

Jay L. Lazar
1655 Valley Center Parkway, Suite 200
Bethlehem, Pennsylvania 18017
(610) 694-2558

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULES 11.2 AND 40.1

Skyline, by its undersigned counsel, hereby certifies pursuant to Local Civil Rules 11.2 and 40.1 that the matter in controversy is not the subject of any other action pending in any court, or of any pending arbitration or administrative proceeding.

Dated: August 15, 2013

OF COUNSEL:

Aldo A. Badini
Peter Lambrianakos
Susannah P. Torpey
Margaret Ciavarella
Brandon W. Duke
WINSTON & STRAWN LLP
200 Park Avenue
New York, New York 10166
(212) 294-6700
abadini@winston.com
plambrianakos@winston.com
storpey@winston.com
mciavarella@winston.com
bduke@winston.com

Diana L. Hughes
WINSTON & STRAWN LLP
101 California Street
San Francisco, California 94111-5802
(415) 591-1000
dhughes@winston.com

Jay L. Lazar
1655 Valley Center Parkway, Suite 200
Bethlehem, Pennsylvania 18017
(610) 694-2558

WINSTON & STRAWN LLP
*Attorneys for Plaintiff Skyline Steel, LLC*

By:     s/ James S. Richter
      James S. Richter
      jrichter@winston.com
      Melissa Steedle Bogad
      mbogad@winston.com

73

## CERTIFICATION PURSUANT TO LOCAL CIVIL RULE 201.1

Pursuant to Local Civil Rule 201.1, the undersigned counsel for Skyline hereby certifies that as a result of the nature of Skyline's causes of action, this action is not appropriate for compulsory arbitration.

Dated: August 15, 2013

s/ James S. Richter

James S. Richter
jrichter@winston.com

74